# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 03-2828

TONJA TREADWAY,

*Plaintiff-Appellant,*

v.

GATEWAY CHEVROLET OLDSMOBILE INC.,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 01 C 9921—**James B. Moran**, *Judge.*

ARGUED JANUARY 20, 2004—DECIDED APRIL 2, 2004

Before CUDAHY, KANNE and EVANS, *Circuit Judges.*

CUDAHY, *Circuit Judge.* Tonja Treadway sought financing to buy a used automobile through Gateway Chevrolet Oldsmobile. After reviewing her credit report, Gateway decided that it would be futile to send her application to any lender. Instead of notifying her of this decision, however, Gateway indicated that it could get her financing if she had a cosigner. Treadway was able to produce her godmother as a "cosigner", but it ultimately turned out that Gateway had never obtained financing for Treadway, and her godmother

was led to purchase the car herself. Treadway filed a suit against Gateway under the Equal Credit Opportunity Act (ECOA) and the Fair Credit Reporting Act (FCRA) based on its failure to notify her that it did not send her application to any lender. The district court dismissed both claims, and this appeal followed.

## I.

Tonja Treadway received a direct-mail solicitation from Gateway Chevrolet Oldsmobile, a seller of new and used automobiles, indicating that she was "pre-approved" for the financing of the purchase of a car. Treadway called the number listed on the mailing and gave Gateway her social security number so that it could access her credit report. Gateway insists that it does not itself provide financing for the cars it sells or leases. Instead, it attempts to arrange for financing through banks or finance companies. Gateway obtained a copy of Treadway's credit report. Based on the credit report, Gateway determined that Treadway would not be eligible for financing. This could not have been particularly surprising to Gateway given that it had purchased her name (in order to send the direct-mail solicitation) from a list of people who had recently filed for bankruptcy. Because she was not creditworthy, Gateway unilaterally decided not to seek financing on behalf of Treadway from any bank or finance company. In fact, it was common practice for Gateway not to seek financing for those that it determined to be ineligible for credit. *See* Supp. App. at 3, ¶ 5 (Gateway's statement of uncontested facts) ("If the review of the credit report shows that the customer would not likely be eligible for financing with any bank or finance company, Gateway would not submit an application for financing with any bank or finance company because there would be no benefit to the customer or

Gateway.").[1] Of course, it is not surprising that this has occurred regularly in the course of Gateway's business, given that it sometimes solicits potential customers from amongst those who have declared bankruptcy.

Shortly after her call, Treadway received a return call from Gateway inviting her to come to the dealership. On October 17, 2001, she made a visit to Gateway. According to Treadway, Gateway failed to inform her that it had decided not to seek credit on her behalf. To the contrary, it indicated that it had found a bank that would finance Treadway, but the bank would not finance a used car— only a new car. Moreover, Treadway would need a cosigner. Treadway agreed to purchase a new car instead of a used car and came up with Pearlie Smith, her godmother, to serve as a cosigner. Concerned as it was with customer convenience, Gateway had an agent deliver papers directly to Smith's house to be signed immediately. Treadway asserts that Smith signed the papers without reading them. After Smith signed, Gateway sold the note to Household Automotive Finance. It turned out that, if Smith had read the papers Gateway hand-delivered, she might have realized that she had committed herself to be the purchaser and sole owner of the car. *See* App. at 17, ¶ 81 (Plaintiff's local rule 56.1 statement: plaintiff's statement of additional facts). This became clear to Smith when she started receiving statements requiring payment on the car note. After Treadway made the first payment on the note on behalf of Smith, both Smith and Treadway refused to make further payment. The car was repossessed and Household continues to demand payment on the note.

---

[1] The appendix annexed to Treadway's opening brief will be referred to as "App." while the appendix annexed to Gateway's opposition brief will be referred to as "Supp. App.".

On December 28, 2001, Treadway filed a suit against Gateway under the ECOA and the FCRA. In an order dated April 12, 2002, the district court granted in part and denied in part Gateway's motion to dismiss. Specifically, the district court dismissed Treadway's FCRA claim because Gateway was not a "user" of credit reports. *See Treadway v. Gateway Chevrolet, Oldsmobile Inc.*, No. 01-C-9921, 2002 WL 554513 (N.D. Ill. April 12, 2002). The district court, however, declined to dismiss Treadway's ECOA claim because it found that, contrary to Gateway's assertion, the notification requirement of ECOA does not require an allegation of discrimination. *Id.* Later, in an order dated June 13, 2003, the district court granted Gateway's motion for summary judgment finding that Treadway had not alleged an "adverse action" as required by the ECOA. *See Treadway v. Gateway Chevrolet, Oldsmobile Inc.*, No. 01-C-9921, 2003 WL 21372469 (N.D. Ill. June 13, 2003). This appeal followed.

## II.

### A.   Equal Credit Opportunity Act

We review *de novo* the district court's decision to grant summary judgment as to Treadway's ECOA claim, construing all facts and drawing all reasonable inferences from those facts, in favor of the plaintiff, the non-moving party in this case. *See Ceruti v. BASF Corp.*, 349 F.3d 1055, 1060 (7th Cir. 2003). Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56.

The ECOA was originally enacted in 1974 to prohibit discrimination in credit transactions. *See Fischl v. General Motors Acceptance Corp.*, 708 F.2d 143, 146 (5th

Cir. 1983). It was amended in 1976 to require creditors to furnish written notice of the specific reasons why an adverse action was taken against a consumer. *Id.*; 15 U.S.C. §§ 1691(d)(2) and (3) ("A statement of reasons meets the requirements of this section only if it contains the specific reasons for the adverse action taken.").[2] In this case, although Gateway ultimately got Treadway into a vehicle based on her godmother's credit, it did not even attempt to obtain financing for Treadway based on her own credit, as she requested. While an automobile dealership is sometimes considered merely an "arranger" or "referrer" with regard to credit, here Gateway effectively became the denier of credit. Therefore, we must decide as a matter of first impression whether an automobile dealership's unilateral decision not to submit a credit application to any lender constitutes an "adverse action" for purposes of the ECOA. Based upon the plain language, the commentary to and the purpose of the statute, we find that the decision not to submit a credit application to any lender does constitute an adverse action.

Any analysis must begin with the language of the statute itself. *See Pittway Corp. v. United States*, 102 F.3d 932, 934 (7th Cir. 1996). The term, "adverse action" is defined in relevant part by the ECOA as "a denial or revocation of credit." 15 U.S.C. § 1691(d)(6).[3] By unilaterally deciding not

---

[2] This notice requirement is not particularly arduous. The Federal Reserve Board has created several sample notification forms which can be modified and used by creditors. *See* 12 C.F.R. § 202, App. C; 68 F.R. 13144, 13184 (March 18, 2003). These short forms essentially require that the creditor (1) describe the type of credit which the applicant requested as well as the adverse action taken, and (2) check off the creditor's principal reasons for taking the adverse action from amongst a pre-printed list. *Id.*

[3] Where Congress has expressly delegated to an agency the responsibility of articulating standards governing a particular area,

(continued...)

to send Treadway's application to *any* lender, Gateway effectively denied credit to Treadway. Whether it is the lender or the dealership that makes the decision, both the action and the outcome are the same. In both cases, the decision maker (1) reviews the applicant's credit report to determine whether she is creditworthy, (2) makes a determination adverse to the applicant (i.e., that she is not creditworthy), (3) decides not to proceed any further in arranging credit and (4) as a result the applicant is not granted credit. There is no logical reason why these same steps would be considered an "adverse action" when taken by a lender but not when taken by a dealership, given that the result is the same in either case.

We interpret statutes to avoid absurd results. *See FutureSource L.L.C. v. Reuters Ltd.*, 312 F.3d 281, 284-85 (7th Cir. 2002) ("Nonsensical interpretations of contracts, as of statutes, are disfavored . . . [n]ot because of a judicial aversion to nonsense as such, but because people are unlikely to make contracts, or legislators statutes, that they believe will have absurd consequences."). Under a contrary interpretation of the statute, if the dealer forwarded the credit application to a lender and that lender determined that the applicant was not creditworthy, either the lender or the dealer would have to provide notice to the applicant.

---

(...continued)

the courts must accord the ensuing regulation substantial deference. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844 (1984). The ECOA delegated to the Federal Reserve Board the power to implement regulations in furtherance of carrying out the Act's purpose. *See* 15 U.S.C. § 1691b(a). These regulations, known as "Regulation B", are found under 12 C.F.R. §§ 202.1-202.15. Regulation B further defines "adverse action" as a "refusal to grant credit in substantially the amount or on substantially the terms requested in an application." 12 C.F.R. § 202.2(c)(1)(i).

*See* 15 U.S.C. § 1691(d)(4). However, if it is the dealer, itself, that makes the same determination and therefore fails to forward the application to any lender, the applicant would receive no notice. This result is inconsistent at best.

Gateway responds with the syllogism that one who is unable to grant credit cannot deny credit either. The facts of this case, however, demonstrate otherwise. Nothing in the definition of "denial" requires that the party doing the denying have the ability to grant as well. *See* Black's Law Dictionary (7th ed. 1999) (defining "denial" as "a refusal or rejection"). To the contrary, courts frequently deny motions which they lack the jurisdiction, discretion or authority to grant. *See, e.g., United States v. Ross*, 243 F.3d 375, 378 (7th Cir. 2001) ("It is a basic principle of law that courts of appeal do not have the authority to overrule a Supreme Court decision, . . . and, therefore, we deny Ross's appeal on the speedy trial issue."); *Miller v. Marriott Int'l, Inc.*, 300 F.3d 1061, 1065 n.4 (9th Cir. 2002) ("Because we lack jurisdiction over the merits of Millers' appeal, we deny these motions without prejudice."); *Pichardo v. I.N.S.*, 104 F.3d 756, 757 (5th Cir. 1997) ("Because we lack jurisdiction, we deny the petition.").

The comments of the Federal Reserve Board further belie Gateway's theory that the ability to grant credit is the *sine qua non* of the ability to take "adverse action" under the ECOA. For instance, when industry commentators criticized a comment to the ECOA as failing to expressly exclude from liability "persons without discretion to decide whether credit will be extended," the Federal Reserve Board declined, in its official response to the criticism, to add an express exclusion or to definitively exclude such parties. *See* 68 Fed. Reg. 13155 (quoted in full *infra* at 14). Moreover, the Federal Reserve Board has suggested that a party may deny credit even before it would necessarily have the authority or ability to grant credit. *See id.* at 13187 (noting that a "creditor" may deny credit before the applicant has

even requested it, but that the creditor must provide the applicant with notice).

In any event, Gateway's syllogism relates more to the question whether Gateway is a "creditor" for purposes of the ECOA than to whether its activity constitutes an "adverse action." We will address this issue shortly, but for now it suffices to note that the ECOA does not limit its definition of "creditor" to those with the ability to extend credit. *See* 15 U.S.C. § 1691a(e) (defining "creditor," *inter alia*, as "any person who regularly arranges for the extension, renewal, or continuation of credit"); 12 C.F.R. § 202.2(*l*) ("Creditor means a person who, in the ordinary course of business, regularly *participates in* a credit decision . . . .") (emphasis added).

Any other interpretation of the statute would run contrary to the purpose of the strict notice requirement. Congress described this requirement as

> a strong and necessary adjunct to the antidiscrimination purpose of the legislation, for only if creditors know they must explain their decisions will they effectively be discouraged from discriminatory practices. Yet this requirement fulfills a broader need: rejected credit applicants will now be able to learn where and how their credit status is deficient and this information should have a pervasive and valuable educational benefit. Instead of being told only that they do not meet a particular creditor's standards, consumers particularly should benefit from knowing, for example, that the reason for the denial is their short residence in the area, or their recent change of employment, or their already over-extended financial situation. In those cases where the creditor may have acted on misinformation or inadequate information, the statement of reasons gives the applicant a chance to rectify the mistake.

*Fischl*, 708 at 146 (*quoting* 147 S.Rep. No. 94-589, 94th Cong., 2d Sess., *reprinted in* 1976 U.S. Code Cong. & Admin. News, pp. 403, 406). In sum, the notice requirement serves two purposes: it discourages discrimination and it educates consumers as to the deficiencies in their credit status. If an automobile dealership that decides against referring a particular applicant to any lender need not provide notice of this decision to the applicant, then it becomes significantly easier for it to discriminate. *See Lacey v. William Chrysler Plymouth Inc.*, No. 02-C-7113, 2004 WL 415972, at *5 (N.D. Ill. February 23, 2004) (noting that "excusing a car dealership from complying with the ECOA's notice requirements because it did not submit a customer's credit application to a lender would undercut the [anti-discriminatory] purpose of the Act."). While it is true that the victim of discrimination may still be able to seek redress under 12 C.F.R. § 202.4(a) ("[a] creditor shall not discriminate against an applicant on a prohibited basis regarding any aspect of a credit transaction"), if an applicant never receives notice, it will be difficult for her to ever determine that she was the victim of discrimination. This is particularly true because, as was the case here, without proper notice, the applicant may assume that her application *was* sent to lenders, and it was the lenders who did the rejecting.[4] Car dealers could throw the credit report of every minority applicant in the "circular file"

---

[4] Treadway alleged in her complaint that "Gateway Chevrolet attempted to arrange financing for Treadway" and that "Treadway was denied credit with respect to the transaction for which Gateway Chevrolet attempted to arrange financing." App. at 28, Cplt. ¶¶ 12, 13. It was not until later into discovery that Treadway learned that Gateway had decided not to send her application to any lender.

and none would be the wiser.[5] Moreover, the notice requirement is intended to prevent discrimination *ex ante* because "if creditors know they must explain their decisions . . . they [will] effectively be discouraged" from discriminating. *Fischl*, 708 F.2d at 146. The fact that victims may be able to seek redress after having already experienced discrimination does not fulfill the preventive purpose of the statute.

Additionally, the contrary rule thwarts the educational purpose of the statute. If dealers are permitted to unilaterally decide not to send a credit application to any lender without notice, the applicant will never learn about the deficiencies in her credit status and whether there are any errors in her credit report. Therefore, based on the foregoing analysis, we find that Gateway's action constitutes an "adverse action" for purposes of the ECOA.

Next, we must determine whether Gateway can be considered a "creditor" for purposes of the ECOA, for the notice requirements of the ECOA apply only to creditors. *See* 15 U.S.C. § 1681(d)(2) ("Each applicant against whom an adverse action is taken shall be entitled to a statement of reasons for such action from the *creditor* . . . .") (emphasis added). The ECOA defines a "creditor" as "any person who regularly extends, renews, or continues credit; *any person who regularly arranges for the extension, renewal, or continuation of credit*; or any assignee of an original creditor who participates in the decision to extend, renew,

---

[5]  It has been argued that such discrimination is contrary to the drive to maximize profits, and therefore it is unrealistic to expect such results from automobile dealerships and other profit-maximizing entities. It would be hard to convince the thousands of African Americans who were denied access to restaurants, shops and motels in the era of segregation, that profit motives will always outweigh discriminatory motives. The fact that discrimination is irrational has never stopped it from occurring in the past, and we decline to find that it will not occur in the future.

or continue credit." 15 U.S.C. § 1691a(e) (emphasis added). Although it failed to do so for Treadway, there can be no question that Gateway regularly arranges credit for its customers. *See Bayard v. Behlmann Auto. Servs., Inc.*, 292 F. Supp. 2d 1181, 1185 (E.D. Mo. 2003) (noting that an automobile dealership "would be considered a creditor as one who regularly arranges for the extension of credit.") The term, "creditor" is also defined by Regulation B:

> Creditor means a person who, in the ordinary course of business, *regularly participates in a credit decision, including setting the terms of the credit.* The term creditor includes a creditor's assignee, transferee, or subrogee who so participates. For purposes of § 202.4(a) and (b), the term creditor also includes a person who, in the ordinary course of business, regularly refers applicants or prospective applicants to creditors, or selects or offers to select creditors to whom requests for credit may be made. A person is not a creditor regarding any violation of the Act or this regulation committed by another creditor unless the person knew or had reasonable notice of the act, policy, or practice that constituted the violation before becoming involved in the credit transaction. The term does not include a person whose only participation in a credit transaction involves honoring a credit card.

12 C.F.R § 202.2(*l*) (emphasis added). The district court found that Gateway was a creditor because it falls within the definition of "a person who in the ordinary course of business regularly refers applicants or prospective applicants to creditors, or selects or offers to select creditors to whom requests for credit may be made." *See Treadway*, 2003 WL 21372469 (quoting the regulation). In so doing, the district court joined a long line of Illinois district court cases which have held that automobile dealerships are "creditors" for purposes of the ECOA because they regularly refer applicants to lenders. *See, e.g., Payne v. Ken Diepholz Ford Lincoln Mercury, Inc.*, No. 02-C-1329, 2004 WL 40631, *4

(N.D. Ill. January 5, 2004); *Gallegos v. Rizza Chevrolet, Inc.*, No. 03-C-4237, 2003 WL 22326523, *2 (N.D. Ill. October 9, 2003); *Burns v. Elmhurst Auto Mall, Inc.*, No. 00-C-5732, 2001 WL 521840, *2 (N.D. Ill. May 16, 2001); *Leguillou v. Lynch Ford, Inc.*, No. 99-C-3449, 2000 WL 198796, *4 (N.D. Ill. February 14, 2000).

However, this line of cases fails to acknowledge that one who regularly refers applicants to lenders is a "creditor" under the ECOA only for purposes of 12 C.F.R. § 202.4(a) (discrimination) and (b) (discouragement).[6] Neither of these sections are applicable in this case. Therefore, the district court improperly found that Gateway was a "creditor" based on the "regularly refers applicants to lenders" portion of the statute.

Nonetheless, Gateway is still considered a "creditor" if it "regularly participates in a credit decision, including setting the terms of the credit." 12 C.F.R § 202.2(*l*) (April 15, 2003).[7] The comment to the regulatory definition of

---

[6] Section 202.4(a) is entitled "discrimination" and notes that "[a] creditor shall not discriminate against an applicant on a prohibited basis regarding any aspect of a credit transaction." Section 202.4(b) is entitled "discouragement" and notes that "[a] creditor shall not make any oral or written statement, in advertising or otherwise, to applicants or prospective applicants that would discourage on a prohibited basis a reasonable person from making or pursuing an application."

[7] Prior to April 15, 2003, Regulation B defined a "creditor" as "a person who, in the ordinary course of business, regularly participates in the decision of whether or not to extend credit." 12 C.F.R § 202.2(*l*) (January 2002). We do not view the subsequent amendment as a substantive change in the regulation but merely as a clarification. *See* 68 Fed. Reg. at 13145 ("The final rule changes the words 'regularly participates in the decision of whether or not to extend credit' to 'regularly participates in a credit decision, including setting the terms of the credit' to *clarify*
(continued...)

"creditor" states that

> [F]or certain purposes, the term creditor includes persons such as real estate brokers, automobile dealers, home builders, and home-improvement contractors who do not participate in credit decisions but who only accept applications and refer applicants to creditors, or select or offer to select creditors to whom credit requests can be made. These persons must comply with § 202.4(a), the general rule prohibiting discrimination, and with § 202.4(b), the general rule discouraging applications.

12 C.F.R. Pt. 202, Supp. I (March 2003). The Federal Reserve Board elaborated on this comment:

> Some industry commenters expressed concern that the clarification would include in the definition of creditor persons without discretion to decide whether credit will be extended. The Board recognizes that in the credit application process persons may play a variety of roles, from accepting applications through extending and denying credit. Comment 2(l)-2 is intended to clarify that where the only role a person plays is accepting and referring applications for credit, or selecting creditors to

---

(...continued)

the definition of 'creditor.' ") (emphasis added). Therefore, retroactive application of the amended regulation is not prohibited. *See Pope v. Shalala*, 998 F.2d 473, 483 (7th Cir. 1993) (holding that a regulation "simply clarifying an unsettled or confusing area of the law . . . does not change the law, but restates what the law according to the agency is and has always been."); *see also Manhattan Gen. Equip. Co. v. Commissioner of Internal Revenue*, 297 U.S. 129, 135 (1936) ("The regulation constitutes only a step in the administrative process. It does not, and could not, alter the statute. It is no more retroactive in its operation than is a judicial determination construing and applying a statute to a case in hand.").

> whom applications will be made, the person meets the definition of creditor, but only for purposes of the prohibitions against discrimination and discouragement. For example, an automobile dealer may merely accept and refer applications for credit, or it may accept applications, perform underwriting, and make a decision whether to extend credit. Where the automobile dealer only accepts applications for credit and refers those applications to *another* creditor who makes the credit decision—for example, where the dealer does not participate in setting the terms of the credit or making the credit decision—the dealer is subject only to §§ 202.4(a) and (b) for purposes of compliance with Regulation B.

68 Fed. Reg at 13155. As one court has summarized, there is "a continuum of participation in a credit decision from no participation, to referring applicants to the decision maker, to final decision making. At some point along the continuum, a party becomes a creditor for purposes of the notification requirements of the Act." *Bayard*, 292 F. Supp. 2d at 1186. In the present case, it is clear that Gateway falls on the "creditor" side of the continuum.

First, Gateway admits that it regularly decides not to send an applicant's credit application to *any* lender. *See* Supp. App. at 3, ¶ 5. By so deciding, Gateway not only "participates" in the decision of whether to extend credit— it makes the decision itself.[8] Second, Gateway frequently

---

[8] Gateway's actions are distinguishable from the common scenario in which an automobile dealership decides to send a credit application to a limited number of the many lenders with which it works. The Federal Reserve Board has clearly indicated that merely "selecting creditors to whom applications will be made" does not make one a "creditor" for purposes of the notice requirements of the ECOA. *See* 68 Fed. Reg. 13155. In that situation,

(continued...)

participates in the credit decision by restructuring the terms of the sale in order to meet the concerns of the creditor. *See* App. at 16, ¶¶ 58-63 (Plaintiff's local rule 56.1 statement: plaintiff's statement of additional facts). For instance, in order to get a lender to change its mind and extend credit, Gateway might (a) insist on more money down; (b) request that the applicant find a cosigner; or (c) lower the price of the car in order to lower the loan-to-value ratio. *Id.* at ¶ 59; *see also Bayard*, 292 F. Supp. 2d at 1186-87 (finding that an automobile dealership "participated in the decision of whether or not to extend credit" where, after lender initially denied credit, the dealer called the lender and advocated for extending credit to the applicant, eventually resulting in the lender's offering credit at a higher interest rate).

Finally, Gateway regularly set the annual percentage rate (APR) associated with the sale. *Id.* at ¶ 60-62. If Gateway set an APR higher than the rate upon which the lender would otherwise agree to extend credit, Gateway and the lender would split the incremental proceeds, known as the "reserve". Therefore, Gateway could increase the APR in order to induce the lender to agree to extend credit and in so doing, it was also "setting the terms of the credit" and benefiting from the loan. *See Payne*, No. 02-C-1329, 2004 WL 40631, at *4 (finding that an automobile dealership was a "creditor" for purposes of the notice requirement of the

---

(...continued)

at least one lender is given the opportunity to decide whether to extend credit. Therefore, it is the lender, rather than the dealer, that makes the credit decision. Where the dealer decides not to send out the application at all, however, it is making the credit decision. Moreover, if the dealer sends the application to at least one lender, there is another party that can provide notice to the applicant. Where the dealer decides not send out the application at all, only the dealer can provide notice.

ECOA where it, *inter alia*, "negotiates the terms of financing for its customers, and has the discretion to set a higher interest rate than the lender requires") While it is likely that only the fact Gateway unilaterally decided not to send Treadway's applicant to any lender would be enough to make Gateway a "creditor", cumulatively these above factors demonstrate that Gateway must be considered a "creditor" for purposes of the ECOA's notice requirements.

Gateway's final argument is that Treadway never submitted an "application" for credit. *See* Gateway Br. at 13. This argument is without merit. According to the regulation, an "application" is "an oral or written request for an extension of credit that is made in accordance with procedures used by a creditor for the type of credit requested." 12 C.F.R. § 202.2(f). Gateway has not identified any way in which Treadway failed to comply with Gateway's usual procedure. Gateway argues that "[b]ecause Treadway never submitted her information *to an actual lender or finance company* she could not have submitted an 'application' as defined under the ECOA." Gateway Br. at 14 (emphasis added). The regulations, however, require that the applicant request an extension of credit from a "creditor" not from a "lender or finance company." 12 C.F.R. § 202.2(f); *see also* § 202.2(e) ("Applicant means any person who requests . . . an extension of credit from a *creditor* . . . .") (emphasis added). As discussed *supra*, Gateway is a creditor for purposes of the ECOA.[9] Therefore, we find that the district court improp

---

[9] Under Gateway's interpretation, even if Gateway had sent Treadway's applications to lenders and those lenders denied her credit, neither Gateway nor the lenders would be required to provide Treadway with notice of the adverse action "because Treadway never submitted her information to an actual lender or finance company." Gateway Br. at 14. This would contradict the express notice requirement of the statute. *See* 15 U.S.C.

(continued...)

**erly granted Gateway's motion for summary judgment with respect to the ECOA.**

## B.  Fair Credit Reporting Act

We review *de novo* the district court's grant of Gateway's motion to dismiss Treadway's FCRA claim. *See Flannery v. Recording Indus. Ass'n of Am.*, 354 F.3d 632, 637 (7th Cir. 2004). We accept all well-pleaded allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Id.* Dismissal under 12(b)(6) is only appropriate when there is no possible interpretation of the complaint under which it can state a claim. *Id.* Congress enacted the FCRA in 1970 to address abuses in the consumer reporting industry. *See* S. Rep. No. 91-517, at 3 (1969); 116 Cong. Rec. 35941 (1970) (statement of Sen. Proxmire); *id.* at 36570 (statement of Rep. Sullivan); *see also Guimond v. Trans Union Credit Info. Co.*, 45 F.3d

---

(...continued)

§1961(d)(4). Gateway's argument, therefore, must be that Treadway's request was merely an "inquiry" which did not become an "application" unless and until Gateway submitted it to a lender. The Federal Reserve Board, however, has specifically addressed "[w]hen an inquiry . . . becomes an application." 68 Fed. Reg. 13187. Accordingly, "if in giving information to the consumer the creditor also evaluates information about the consumer, decides to decline the request, and communicates this to the consumer, the creditor has treated the inquiry . . . as an application and must then comply with the notification requirements under § 202.9." *Id.* Of course, in the case before us, the fact that the dealer failed to communicate to Treadway its negative action on the application as submitted cannot be held against Treadway. Therefore, even if it was not an application in the beginning, when Gateway declined Treadway's request, it became an application and Gateway was required to comply with § 202.9.

1329, 1333 (9th Cir. 1995); *St. Paul Guardian Ins. Co. v. Johnson*, 884 F.2d 881, 883 (5th Cir. 1989); *Hovater v. Equifax, Inc.*, 823 F.2d 413, 416-17 (11th Cir. 1987). Employers were placing increased reliance on consumer reporting agencies to obtain background information on prospective employees. Congress found that agencies were too often reporting inaccurate information that was adversely affecting the ability of individuals to obtain employment. *See Dalton v. Capital Associated Indus., Inc.*, 257 F.3d 409, 414-15 (4th Cir. 2001). As Representative Sullivan remarked, "with the trend toward . . . the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal 'blips' and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable." 116 Cong. Rec. 36570 (1970); *id.* In enacting the FCRA, Congress adopted a variety of measures designed to insure that agencies report accurate information.

The FCRA and ECOA have similar notice requirements. Prior to amendment in 1996, § 1681m of the FCRA provided that "whenever credit or insurance . . . is denied . . . either wholly or partly because of information contained in a credit report . . ., *the user of the consumer report*, shall so advise the consumer against whom such adverse action is taken." *See* 15 U.S.C. § 1681m (pre-1996 version) (emphasis added); *Northrop v. Hoffman of Simsbury, Inc.*, 134 F.3d 41, 48 n.10 (2d Cir. 1997); *Austin v. Bank Am. Serv. Corp.*, 419 F. Supp. 730, 733 (D.C. Ga. 1974). The district court found that Treadway could not state a claim under the FCRA because Gateway was not a "user" of credit reports under the FCRA. *See Treadway*, No. 01-C-9921, 2002 WL 554513. In 1996, however, § 1681m(a) was amended to require that "[I]f *any person* takes any adverse action with respect to any consumer that is based in whole or in part on any information contained in a consumer report, the person

shall provide oral, written, or electronic notice of the adverse action to consumer." 15 U.S.C. § 1681m(a) (emphasis added). The amended § 1681m, therefore, does not require that Gateway be a "user" of credit for purposes of that subsection. *See Northrop*, 134 F.3d at 48 n.10. Even if there were such a requirement, there can be no doubt that Gateway is a "user" of credit. *Id.* at 49 ("[A]n automobile dealership . . . is clearly a party that in the ordinary course of business would have occasion to request and receive credit reports from consumer reporting agencies for the permissible purposes described in § 1681b. It is therefore precisely the sort of party that would be expected to 'use' credit reports under the Act."). Therefore, the district court erred by dismissing this claim on the ground that Gateway was not a "user" of credit.

Nonetheless, dismissal was appropriate because Treadway failed to allege an "adverse action" under the FCRA. The FCRA defines "adverse action" more broadly than does the ECOA. *See Cannon v. Metro Ford*, 242 F. Supp. 2d 1322, 1331-32 (S.D. Fla. 2002). The FCRA definition of "adverse action" starts with the ECOA definition but also includes a "catch-all" phrase which defines "adverse action" as "an action or determination that is—(I) made in connection with an application that was made by, or a transaction that was initiated by, any consumer . . . and (II) [is] adverse to the interests of the consumer." 15 U.S.C. § 1681a(k)(1)(B)(iv); Consumer Reporting Reform Act, H.R. Rep. No. 103-486 at 26 (1994) ("[T]he definition contains a catch-all phrase that makes clear that any action taken or determination made with respect to a consumer application or a consumer initiated transaction that is adverse to the interests of the consumer constitutes an adverse action . . . ."); H.R. Rep. No. 102-692 at 21 (1992); S. Rep. No. 103-209 at 8 (1993); *but see* Anne P. Fortney & Linda B. Dubnow, *The New Fair Credit Reporting Act— New Duties; New Liability; New Questions*, 52 Consumer Fin. L. Q. Rep. 17 at

*20 (1998) (arguing that the "catch-all" language of the FCRA applies only in non-credit transactions).

As we suggested earlier in the context of our discussion of the ECOA, there is no question that Gateway's decision not to send Treadway's application to any lender would also constitute an "adverse action" under the FCRA. The problem for Treadway, however, is that at the time Gateway filed a motion to dismiss, she was not yet aware that Gateway had decided not to send her application to any lender. Her complaint alleged only that "Gateway Chevolet attempted to arrange financing for Treadway" and "Treadway was denied credit with respect to the transaction for which Gateway Chevrolet attempted to arrange financing." App. at 29, Cplt. ¶¶ 12-13. It is doubtful that these allegations are enough to constitute an "adverse action" even under the liberal definition of the FCRA.[10] *See, e.g.*, *Najieb v. Chrysler-Plymouth*, No. 01-C-8295, 2002 WL 31906466, at *6 n.14 (N.D. Ill. 2002) (holding that an automobile dealership's submission of credit reports to

---

[10] It is true that Treadway made the general allegation that "Gateway Chevrolet took adverse action against Treadway based on information contained in a credit report." *Id.* at ¶ 17. It is possible that this general allegation might be enough to sustain a complaint under the liberal pleading requirements of the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 8. However, we have held that "if a plaintiff does plead particulars, and they show he has no claim, then he is out of luck—he has pleaded himself out of court." *Thomas v. Farley*, 31 F.3d 557, 558-59 (7th Cir. 1994); *R.J.R. Services, Inc. v. Aetna Casualty and Surety Co.*, 895 F.2d 279, 281 (7th Cir. 1989) (noting that a court is "not obliged to ignore any facts set forth in the complaint that undermine the plaintiff's claim"). In this case, the district court was unable to assume that Gateway did *not* attempt to arrange financing for Treadway given that Treadway had pleaded the opposite.

seven financial institutions, all of which rejected the application, did not constitute an adverse action under the FCRA).

Apparently Treadway never amended her complaint to allege that Gateway unilaterally decided not to send her application to any lender. Nonetheless, it seems that the district court accepted this allegation as part of the complaint by the summary judgment stage. *See Treadway*, No. 01-C-9921, 2003 WL 21372469 ("The narrow question before us is whether Gateway's decision to not submit her application to a lender constitutes an adverse action requiring notification under section 1691(d)(2)."). Given this fact, and given that Treadway's complaint was deficient only because Gateway improperly withheld information regarding this credit transaction, Treadway should be allowed to amend her complaint to include this allegation.

### III.

For these reasons, we reverse the district court's grant of summary judgment with respect to Treadway's ECOA claim. Further, we affirm the district court's grant of Gateway's motion to dismiss with respect to Treadway's FCRA claim. However, on remand, Treadway must be given the opportunity to amend her complaint to allege an "adverse action" under the FCRA.

A true Copy:

  Teste:

        _____
        *Clerk of the United States Court of*
        *Appeals for the Seventh Circuit*