Kamesha BARNETTE, Plaintiff,

v.

BROOK ROAD, INC., Defendant.

No. 3:05–CV–590 MHL.

United States District Court,
E.D. Virginia,
Richmond Division.

July 18, 2006.

---

John Cole Gayle, Jr., The Consumer Law Group PC, Richmond, VA, Leonard Anthony Bennett, Consumer Litigation Assoc. PC, Newport News, VA, for Plaintiff.

Raymond James Sinnott, III, Kenneth Francis Hardt, Mark Charles Nanavati, Sinnott, Nuckols & Logan PC, Midlothian, VA, for Defendant.

## MEMORANDUM OPINION

LAUCK, United States Magistrate Judge.

Before the Court are cross Motions for Summary Judgment. The Plaintiff, Kamesha Barnette, filed a Complaint against the Defendant, Brook Road, Inc., which trades as Car America ("Car America"), following a failed deal to purchase a car and repossession of that car after financing fell through. She brings claims under the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. §§ 1691—1691f, the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681—1681x, the Virginia Consumer Protection Act ("VCPA"), Va.Code Ann. §§ 59.1-196—207 (Michie 2001 & Supp. 2005), and Article Nine of the Uniform Commercial Code ("UCC"), Va.Code Ann. §§ 8.9A-101—709 (Michie 2001 & Supp. 2005), as well as common law actions of fraud, conversion, and breach of contract. Car America moved for summary judgment on the ECOA, UCC, breach of contract, and conversion claims, and Barnette sought summary judgment on the ECOA, FCRA, and UCC claims.[1] The parties have briefed the issues, and the Court held a hearing on June 27, 2006. Accordingly, the Motions are ripe for disposition.

### I. Standard of Review

A motion for summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

---

1. Responding to the Defendant's Motion for Summary Judgment, Barnette abandoned the conversion and breach of contract claims. (Pl.'s Opp. Def.'s Summ. J. Mot. 13.) The Plaintiff confirmed this stance at oral argument.

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "[A]n apparent dispute is not 'genuine' within contemplation of the summary judgment rule unless the non-movant's version is supported by sufficient evidence to permit a reasonable jury to find the facts in his favor." *Sylvia Dev. Corp. v. Calvert County,* 48 F.3d 810, 818 (4th Cir.1995) (citations omitted). A fact is material if under governing law it might affect the outcome of the litigation. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

"The party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Rivanna Trawlers Unlimited v. Thompson Trawlers, Inc.,* 840 F.2d 236, 240 (4th Cir.1988). A court views the evidence and reasonable inferences drawn therefrom in the light most favorable to the nonmoving party. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. Whether an inference is reasonable must be considered in conjunction with competing inferences to the contrary. *Sylvia,* 48 F.3d at 818. Nonetheless the nonmoving party is entitled to have " 'the credibility of his evidence as forecast assumed.' " *Miller v. Leathers,* 913 F.2d 1085, 1087 (4th Cir. 1990) (en banc) (quoting *Charbonnages de France v. Smith,* 597 F.2d 406, 414 (4th

Cir.1979)). When, based on the evidence presented, a fair minded jury could not reasonably find for the plaintiff, summary judgment is appropriate. *See Anderson,* 477 U.S. at 252, 106 S.Ct. 2505; *EEOC v. Clay Printing Co.,* 955 F.2d 936, 942–43 (4th Cir.1992). Ultimately, the court must adhere to the affirmative obligation to bar factually unsupportable claims from proceeding to trial. *Felty v. Graves–Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir. 1987) (citing *Celotex,* 477 U.S. at 323–24, 106 S.Ct. 2548).

## II. Findings of Undisputed Fact

On or about May 11, 2004, Barnette received a flyer in the mail that stated, "You are Pre–Qualified by CPS, a national auto finance company" for a loan of up to $16,687.00. (Pl.'s Mot. Summ. J. Mem. Supp. Ex. 1.) CPS issued the flyer on behalf of Car America. (Cunningham Dep. 99–100.) The flyer directed its recipient to take the offer to Car America. (Pl.'s Mot. Ex. 1.) Attached to the flyer was a "Fast Track Reservation Form" that sought information as to the customer's address, employment, and income and requested authorization for CPS and the car dealer to obtain a credit report to "finalize auto financing." (*Id.*) Barnette contacted by telephone and then visited Car America where Roscoe Pender, a sales person, provided her a credit application. (Cunningham Dep. 61; Pender Aff. Ex. 1.) She completed the application and submitted it to Car America. (Pender Aff. Ex. 1.) On the credit application, Barnette indicated that she worked full-time at Lowe's and part-time at Courtyard Assistance. (*Id.*)

The process employed by Car America for obtaining financing and executing a sale is as follows. Until April 2004, Car America provided financing itself, but when Barnette sought to buy a car, Car America had stopped financing loans.

(Cunningham Dep. 44–45, 55, 86.) After a customer provides a credit application, the finance manager makes a "payment call" to a lender to obtain preapproval at a certain monthly payment for the sale of a car. (*Id.* at 18.) When Car America submits a credit application, the lender sometimes makes a counteroffer, and Car America communicates the counteroffer to the buyer. (*Id.* at 61.) If the counteroffer requires a rate that would make Car America lose money on the deal, Car America will cancel the sale. (*Id.* at 65.) Some lenders permit Car America to collect a fee on the financing by increasing the interest rate. (*Id.* at 67.) However, Car America does not receive money for shopping a loan to one of the lenders, Regional Acceptance Corporation ("Regional"), who charges Car America a $535 fee. (*Id.* at 68.) After a customer has been pre-approved by a lender, she selects a vehicle. (*Id.* at 79–80.) Based on the particulars of the vehicle, Car America drafts a contract, including a Retail Installment Sales Contract ("RISC"), setting the terms of the sale and financing. (*Id.*) The dealer then submits the sales contract and financing information to the lender for approval of the terms. (*Id.* at 79.) In setting the terms, Car America structures the loan based on parameters established by the lenders. (*Id.* at 63.) Car America also chooses which lender to shop the loan to based on the lender's criteria. (*Id.* at 66.) The lender sets the interest rate. (*Id.* at 62.)

On May 13, 2004, Barnette returned to Car America. She met with Pender, test drove a car, and discussed her credit. (Barnette Dep. 16–17.) Barnette negotiated with Pender concerning the monthly payment: he sought $400, and she insisted upon $350. (*Id.* at 24.) According to Dave Cunningham, the sales manager, someone at Car America pulled Barnette's credit report to determine whether to enter into a deal to sell her a car, including whether she could qualify for financing. (Cunningham Dep. 74–75.) Car America then shopped her application to two lenders, Regional and United Auto Credit Corporation ("United Auto"). (Cunningham Dep. 75.) Barnette was aware that Car America was not the lender and that a third party would provide the loan. (Barnette Dep. 26, 105.) Regional granted conditional approval of a loan for $12,000, with a $350 maximum monthly payment and $1000 minimum payment, subject to proof of income.[2] (Pender Aff. ¶¶ 4–5; Cunningham Dep. 77, 87.) Regional initially required a down-payment of $1000, but Car America negotiated with the lender for a payment of $500 instead. (Cunningham Dep. 78, 112.) After receiving conditional approval for a loan, Barnette chose a car and was told that she would need to provide proof of insurance, which she did not have at the time. (Barnette Dep. 24.)

Barnette signed various documents concerning the sale of the car. (Cunningham Dep. 75.) She did not read them. (Barnette Dep. 30.) Pender guided her through the process of reviewing the documents. (Pender Aff. ¶¶ 2–11.) One of the documents was a Buyer's Order that conditioned the sale upon approval of the RISC. (Pl.'s Mot. Ex. 3.) Barnette and Car America signed the RISC, which fixed the price of the car, annual percentage rate of the loan, finance charge, amount financed, monthly payment of $350, down-payment of $500 cash and $500 for the trade-in, and

---

**2.** Barnette asserts that Pender told her that she was approved for the loan; Pender contends that approval of the loan was conditioned upon Barnette demonstrating adequate income. For the purpose of addressing the claims presented in the Motions for Summary Judgment, this dispute is not material.

total payments. (Pl.'s Mot. Ex. 4.) The RISC identified Car America as the "creditor-seller" and indicated that it "assigns its interest in this contract to Regional." (*Id.*) By signing the RISC, Barnette agreed to give Car America a security interest in the car. (*Id.*) She also agreed that Car America could repossess the vehicle if she defaulted on the loan. (*Id.*) Additionally, Barnette and Car America entered into a Delivery Agreement that incorporated the RISC.[3] (Pl.'s Mot. Ex. 6.) The Delivery Agreement provided, in pertinent part:

> Buyer understands that all financing decisions are made by a financial source not affiliated with Dealer and that financing source is the credit-reporting agency in accordance with the Fair Credit Reporting Act. Seller will attempt to sell the contract on terms satisfactory to the Seller. If the Seller is successful in doing so, the contract (and all other documents executed by Buyer) shall be deemed delivered and fully binding.
>
> If seller does not receive approval from a lending source for the Contract on terms acceptable to Dealer, Dealer may rescind the sales transaction and the Contract. Buyer agrees that upon notice from Seller, Buyer shall return the vehicle .... Seller retains a priority security interest in the vehicle and upon Buyer's failure to return the vehicle, Seller shall be entitled to all remedies ... including ... repossession ....

(*Id.*)

Car America provided dealer tags and a "Certificate of Ownership," which is a temporary registration, but Barnette did not receive title to the car. (Cunningham Dep. 110–11, 115.) Barnette agreed to make a $500 down-payment and paid $200 on May 13, 2004. (Barnette Dep. 36, 101.) Barnette drove off the lot with the new car and traded-in her other car, transferring title to Car America. (*Id.* at 25.)

On May 17, 2004, Barnette returned to Car America and provided proof of insurance. (*Id.* at 40.) Around that time, Regional notified Car America that it required proof of income before it could approve the loan, and Cunningham advised Barnette of Regional's requirement.[4] (Cunningham Dep. 40; Cunningham Aff. ¶ 8.) She returned to Car America on May 28, 2004, and paid the remaining $300 of the down-payment. (Cunningham Dep. 40, 102.) When the lender either did not receive the requested proof of income or her income was determined insufficient, Cunningham, on or about May 28, 2004, notified Barnette that the lender required a cosigner. (*Id.* at 40; Cunningham Aff. ¶ 11; Barnette Dep. 43, 45, 47, 96.)

On June 1, 2004, Barnette sent a certified letter to Car America stating that she did not intend to return her car. (Cunningham Aff. Ex. 3.) Because both Regional and United Auto declined to finance Barnette's purchase of the car, Car America cancelled the sale and repossessed the car on June 3, 2004. (Cunningham Dep. 41, 44.) No car payments had become due, and Barnette had not defaulted. (*Id.* at 42, 116.) Car America returned $250 of Barnette's $500 down-payment. (*Id.* at 113.) It retained a portion of her payment to cover the cost of repossession. (*Id.*) After repossessing the car, Car America

---

**3.** The parties dispute whether Pender told Barnette that the Delivery Agreement did or did not apply to her. Again, this dispute is not material to the claims addressed in the Motions.

**4.** Barnette disputes that Car America informed her that she had to provide additional proof of income. (Barnette Dep. 65.)

did not notify Barnette prior to the sale of collateral. (Answer ¶ 18; Cunningham Dep. 116.) Car America returned Barnette's trade-in. (Barnette Dep. 121–22.)

On May 18, 2004, United Auto issued a notice to Barnette stating that it had refused to extend financing for a car from Car America. (Pl.'s Mot. Ex. 7; Def.'s Mot. Summ. J. Mem. Supp. Ex. 3.) The reason given for declining credit was "instability of employment." (*Id.*) Citing an inability to verify income, Regional also denied credit and provided Barnette with notice of its decision on June 5, 2004. (Pl.'s Mot. Ex. 7; Def.'s Mot. Ex. D.) The only reference to Car America in either notice was United Auto's identification of Car America as the car dealer. Car America does not itself send out adverse action notices because it relies on the lender to send adverse action notices. (Cunningham Dep. 24–25, 92.)

### III. Analysis

### A. Plaintiff's Motion to Strike

■ At the outset, the Court must address an evidentiary issue. Barnette asserts that Exhibits C and D to the Defendant's Motion for Summary Judgment, the United Auto and Regional notices, were not properly authenticated. Thus, she objects to the Court's consideration of them. Barnette, however, has attached these same exhibits to her Motion for Summary Judgment. (*See* Pl.'s Mot. Ex. 7.) The Defendant has not contested the authenticity of Barnette's exhibits, and the Court will consider them. Accordingly, the Motion to Strike is moot.

### B. ECOA (Count 1)

Congress enacted the ECOA to prohibit discrimination in credit transactions.

*Treadway v. Gateway Chevrolet Oldsmobile, Inc.*, 362 F.3d 971, 975 (7th Cir.2004). The ECOA requires that a creditor, upon rendering an adverse action, provide to the credit applicant a statement of the reasons for taking such action. 15 U.S.C. § 1691(d)(2). Car America asserts that the ECOA does not govern its actions because it did not finance car loans. Under this premise, Car America argues that it was not a creditor and could not have rendered an adverse action on a loan. The Court turns to the first of these arguments: whether the Defendant was a creditor.

■ A "creditor" is "any person who regularly extends, renews, or continues credit; any person who regularly arranges for the extension, renewal, or continuation of credit . . . ." 15 U.S.C. § 1691a(e); *see also* 12 C.F.R. § 202.2(*l*) (a creditor is "a person who, in the ordinary course of business, regularly participates in a credit decision, including setting the terms of the credit.").[5] Thus, under the plain language of the statute, and contrary to Car America's contention, the term "creditor" encompasses more than the entity that ultimately provides or refuses to provide credit. Often in this process, various entities act along " 'a continuum of participation in a credit decision from no participation, to referring applicants to the decision maker, to final decision making. At some point along the continuum, a party becomes a creditor for purposes of the notification requirements of the [ECOA].' " *Treadway*, 362 F.3d at 980 (quoting *Bayard v. Behlmann Auto. Servs., Inc.*, 292 F.Supp.2d 1181, 1186 (E.D.Mo.2003)); *accord Padin v. Oyster*

---

**5.** Because Barnette does not allege discrimination, the definition of "creditor" that encompasses a person who refers applicants to a creditor, *see* 12 C.F.R. § 202.2(1), does not pertain.

*Point Dodge,* 397 F.Supp.2d 712, 718 (E.D.Va.2005).

■■ Whether a car dealer is a creditor is a fact specific question, and courts have set forth the following guideposts to aid in this determination: (1) whether the dealer sets the terms of the credit; (2) whether the dealer negotiates with the customer as to the payment terms; (3) whether the dealer receives proceeds from a portion of the interest rate; and (4) whether the dealer conducts an initial assessment of the customer's credit application to screen those that it determines not to send to a lender. *See Treadway,* 362 F.3d at 980; *Padin,* 397 F.Supp.2d at 719. While no factor is necessarily dispositive, a court must view the party's conduct in extending, renewing, or continuing credit or arranging for such credit in the particular circumstances of the case.

Here, Car America admits that it accessed Barnette's credit report and assessed it for suitability before sending her credit application to a lender. In *Treadway,* the dealer performed a similar function, but chose not to shop the customer's credit to a lender. The court found this act an adverse action that brought the dealer within the decision-making process, thereby invoking the ECOA's governance over the dealer's actions. *Treadway,* 362 F.3d at 978, 980. While Car America passed Barnette's credit application on to two lenders, its eligibility determination made it the initial player in the credit making decision, constituting a step along the continuum.

■ After finding Barnette credit-worthy, Car America, using guidelines established by the lenders, set the terms of the loan in the RISC and then shopped it to selected lenders. Merely shopping a loan to lenders is not sufficient to render a dealer a creditor. *See Padin,* 397 F.Supp.2d at 719. However, in setting the terms of the RISC, Car America did more than mechanically plug in the lender's numbers. Pender and Barnette negotiated her monthly payment, and Car America convinced Regional to lower the minimum down-payment from $1000 to $500, keeping a $500 trade-in for its own benefit. Furthermore, as memorialized in the Delivery Agreement and as stated by Cunningham, the terms of any financing arrangement were subject to Car America's approval, and Car America could cancel the deal if it deemed the terms unacceptable. This practice injects Car America into the process of setting financing terms for each deal. Car America also acted as an intermediary between Regional and Barnette, advising her that she needed to provide proof of income and, later, to recruit a cosigner. *See Padin,* 397 F.Supp.2d at 719 (noting that requesting a cosigner can weigh toward being considered a "participating creditor" under the ECOA). Based on these actions and despite Car America's contention that it did not profit from shopping its customers' credit applications to lenders, no question exists that Car America participated in the credit decision. Thus, the Defendant was a creditor under the ECOA. *See Treadway,* 362 F.3d at 978–80; *Padin,* 397 F.Supp.2d at 718–19.

■ The Court must next examine whether Car America took an adverse action. Under the ECOA, an "adverse action" is "a denial or revocation of credit, a change in the terms of an existing credit arrangement, or a refusal to grant credit in substantially the amount or on substantially the terms requested." 15 U.S.C. § 1691(d)(6); 12 C.F.R. § 202.2(c). In *Padin,* this Court found an adverse action when a dealer raised the interest rate above that set by the lender in order to profit from a "reserve." *Padin,* 397 F.Supp.2d at 719. In *Treadway,* the deal-

er, based on its assessment of a customer's credit, refused to send the customer's credit application to a lender, effectively denying credit. *Treadway*, 362 F.3d at 978. Both constituted adverse actions.

Unlike those circumstances, the evidence before this Court is that Car America shopped Barnette's credit application to two lenders and it would not have directly profited, aside from selling the car, from financing through Regional. Moreover, the two lenders, Regional and United Auto, refused to extend credit to Barnette. Furthermore, Regional determined that a cosigner was necessary. While Car America communicated that term to Barnette, the uncontroverted evidence is that it did not set or benefit from this additional requirement. Car America did not deny credit, refuse to grant credit on substantially the terms requested, or change the terms set forth in the RISC and, thus, did not take an adverse action on Barnette's credit application. The plain language of the ECOA limits "adverse action" to decisions on a customer's credit. It does not extend, as Barnette urges, to subsequent actions after a denial of credit, such as a recision of a sale or repossession of a car. Accordingly, the Court grants summary judgment to the Defendant on the ECOA claim.

## C. FCRA (Count 2)

▆▆▆▆ The FCRA endeavors to ensure "fair and accurate credit reporting . . . ." *See* 15 U.S.C. § 1681. Under the FCRA, if a person takes an adverse action against a consumer based on information contained in the consumer's credit report, the person shall provide notice of the adverse action. 15 U.S.C. § 1681m(a). "Through this requirement, Congress sought to promote the rights of consumers by giving them essential information about how their credit report is used, information that they could obtain in no other way." *Reynolds v. Hartford Fin. Servs. Group, Inc.*, 435 F.3d 1081, 1091–92 (9th Cir.2006). Car America's arguments under the FCRA mirror those presented in the ECOA claim: Car America was not a "user" of Barnette's credit report, and it did not take an adverse action.

▆▆▆▆ The FCRA "imposes certain obligations on 'users' of consumer reports that deny credit or increase the charge for credit to consumers based on information contained in consumer reports issued by consumer reporting agencies . . . ." *Northrop v. Hoffman of Simsbury, Inc.*, 134 F.3d 41, 46 (2d Cir.1997); *Padin*, 397 F.Supp.2d at 720 n. 13 (noting that the FCRA's requirements apply to any "user" of a consumer's credit report, not just to credit reporting agencies). A person may use a credit report for the purpose authorized by the consumer or for other purposes authorized by statute. 15 U.S.C. § 1681b(a); *Padin*, 397 F.Supp.2d at 720. In pulling Barnette's credit report and conducting a preliminary credit-worthiness check based on the information contained in it, Car America "used" Barnette's credit report as contemplated in the FCRA.[6] *See*

---

**6.** Car America contends that it did not "use" Barnette's consumer report because its asserted use fell within an exclusion to the definition of a "consumer report," which provides:

 any report in which a person who has been requested by a third party to make a specific extension of credit directly or indirectly to a consumer conveys his or her decision with respect to such request, if the third

party advises the consumer of the name and address of the person to whom the request was made, and such person makes the disclosures to the consumer required under section 1681m of this title . . . .

15 U.S.C. § 1681a(d)(2)(C). The Plaintiff did not respond to this argument. Even so, Car America's argument falls short. While Car America provided Barnette with Region-

*Treadway*, 362 F.3d at 982; *Northrop*, 134 F.3d at 49.

■ Turning to the second inquiry, the FCRA adopted the definition of "adverse action" from the ECOA, *see* 15 U.S.C. § 1681a(k), but an "adverse action" under the FCRA also includes "an action taken or determination that is—(I) made in connection with an application that was made by, or a transaction that was initiated by, any consumer . . .; and (II) adverse to the interests of the consumer." 15 U.S.C. § 1681a(k)(1)(B)(iv). In this case, because Regional denied credit, Car America rescinded the sale and then repossessed the car. Although these activities were not covered under the ECOA, they fall within the scope of the FCRA. Unquestionably, cancelling a sale upon denial of credit and then repossessing the vehicle are acts adverse to the interests of the consumer, and Car America took them in connection with an application or transaction made by Barnette. *See, e.g., Cannon v. Metro Ford, Inc.* 242 F.Supp.2d 1322, 1331–32 (S.D.Fla. 2002); *Castro v. Union Nissan, Inc.*, Civ. No. 01C4996, 2002 WL 1466810, at * 4 (N.D.Ill. July 8, 2002). Having found an adverse action, the Court must next determine whether Car America complied with the FCRA's notice requirements.

■ When "any person" takes an adverse action against a consumer based on information contained in a consumer report, that person shall provide notice of the adverse action. *See* 15 U.S.C. § 1681m(a). Here, Car America repossessed a car because the owner's application for credit was denied, not because the owner had defaulted, so the action clearly happened as a result of information contained in a credit application. *See* 15

U.S.C. § 1681m(a); *cf. Castro*, 2002 WL 1466810, at *4 (noting that repossession of a car for the owner's failure to pay, while an adverse action, was not taken based on information contained in credit application and, thus, did not trigger the notice requirement). Car America concedes that it did not provide notice; however, it asserts that the notices provided by Regional and United Auto, the lenders who denied credit, also covered Car America. The Court of Appeals for the Ninth Circuit dismissed a similar argument, finding that the notice requirement extended to "any person" who took an adverse action "in connection with" a credit application. *Reynolds*, 435 F.3d at 1095–97. The court determined that this language covered a variety of entities involved in the transaction and imposed joint responsibility on the entities taking an adverse action to provide notice of their respective roles. *Id.* This Court finds the Ninth Circuit's reasoning persuasive. Accordingly, Car America also must have provided the required notice. It did not, and the Court grants summary judgment for Barnette as to the Defendant's violation of the notice requirement under the FCRA. At trial, the jury will determine whether Car America acted willfully or negligently and whether damages are appropriate.

**D. UCC (Count 7)**

■ In the final claim raised on summary judgment, Barnette asserts that the Defendant violated Article Nine of the UCC by repossessing the car and failing to provide notice of its sale. Car America argues that Barnette had no interest in the car, was not a debtor, and was not in default; thus, it contends the circumstances she presents are not covered by

al's name, it did not provide the address (*see* Pl.'s Mot. Ex. 4), as required by the statute. Thus, assuming that this exception applies,

the Defendant's use of Barnette's credit report does not fit within it.

Article Nine. Alternatively, the Defendant argues that the transaction was properly rescinded as contemplated in the RISC.

Article Nine of the UCC covers any "transaction, regardless of its form, that creates a security interest in personal property ... by contract ...." Va Code Ann. § 8.9A–109 (Michie 2001); *C.F. Garcia Enters., Inc. v. Enter. Ford Tractor, Inc.*, 253 Va. 104, 480 S.E.2d 497, 499 (1997).[7] By the terms of the Delivery Agreement, Car America retained a security interest in the car. For Barnette to avail herself of the protections of Article Nine, she must have been a debtor. A "debtor" is "a person having an interest, other than a security interest or other lien in the collateral, whether or not the person is an obligor ...." Va.Code Ann. § 8.9A–102(28) (Michie 2001 & Supp.2005). Car America contends that Barnette had no interest in the car because she never obtained title. This argument overlooks Virginia Code § 8.9A–202, which provides that the provisions of Article Nine apply "whether title to collateral is in the secured party or the debtor." Furthermore, Barnette made a down-payment on the car and assumed an obligation to pay monthly installments. Thus, she obtained an interest in the collateral as a debtor. *See Rhoten v. United Va. Bank*, 269 S.E.2d 781, 783–85 (1980).

Having found Barnette to be a debtor, the focus shifts to the validity of Car America's repossession of the car. "After default, a secured party ... may take possession of the collateral ...." Va. Code Ann. § 8.9A–609 (Michie 2001); *see also* Va.Code Ann. § 8.9A–601(a) (Michie 2001 & Supp.2005). Car America and Barnette agree that no default occurred.[8] (*See* Pl.'s Mot. 6; Def.'s Mot. 11.) Typically, a secured creditor may not take possession of the collateral until the debtor defaults. *See Nat'l Acceptance*, 491 F.Supp. at 1272. The parties, however, may vary the provisions of the UCC by agreement, as long as they act in good faith. *See* Va.Code Ann. § 8.1A–302 (Michie Supp. 2005); *Becker v. Nat'l Bank & Trust Co.*, 222 Va. 716, 284 S.E.2d 793, 794 (1981). This provision affirmatively establishes "that freedom of contract is a principle of the Uniform Commercial Code." Va.Code. Ann. § 8.1A–302, cmt. 1.[9] Thus, the parties are free to agree that the secured creditor may repossess the collateral after the occurrence of something other than default. Although Barnette states she did not read it, in the Delivery Agreement she agreed that should Car America not obtain financing, it could rescind the sales contract and she must return the car. If Barnette did not return the car, Car America could avail itself of the remedies provided by law, including repossession. The facts played out in just this fashion, and Barnette is bound by the contract she signed. Accordingly, Car America lawfully repos-

7. The UCC claim arises under the Court's supplemental jurisdiction, 28 U.S.C. § 1367; accordingly, Virginia law governs. *See Nat'l Acceptance Co. of Am. v. Va. Capital Bank*, 491 F.Supp. 1269, 1272 (E.D.Va.1980).

8. The UCC does not define the term "default." *Cofield v. Randolph County Comm'n*, 90 F.3d 468, 471 (11th Cir.1996). Courts apply the meaning of default as assigned by the parties in a security agreement or as developed by common law. *See id.; Moe v. John Deere Co.*, 516 N.W.2d 332, 335 (S.D.

1994); *see also C.F. Garcia*, 480 S.E.2d at 500 (noting that the parties' agreement did not define default). The ordinary meaning of default is failure to pay. *Cofield*, 90 F.3d at 471. Here, no payment had become due.

9. The Comments to the UCC are not binding law, but are persuasive dicta. *See Girard Trust Co. v. Strickler (In re Varney Wood Prods., Inc.)*, 458 F.2d 435, 437 (4th Cir. 1972).

sessed the car. The inquiry, however, does not end there.

 When financing fell through, Car America, pursuant to the Delivery Agreement, garnered certain rights, and it incurred certain obligations when it repossessed the car. *See Tidewater Fin. Co. v. Moffett (In re Moffett)*, 356 F.3d 518, 521–22 (4th Cir.2004). After repossessing the collateral, a secured party may dispose of it in a commercially reasonable manner, Va.Code Ann. § 8.9A–610(a), but it must provide notice to the debtor 10 days before doing so, Va.Code Ann. §§ 8.9A–611—614 (Michie 2001). It is the secured party's repossession of the collateral, not necessarily the default, that triggers the notice requirement. *See Moffett*, 356 F.3d at 521–22. Absent valid waiver by the debtor in a written agreement made after default, the parties could not alter the notice provisions. *See* Va.Code Ann. § 8.9A–602(7) (Michie 2001); Va.Code Ann. § 8.9A–624(a) (Michie 2001); *Chrysler Credit Corp. v. Curley*, 753 F.Supp. 611, 616–17 (E.D.Va.1990) (construing predecessor sections of Article Nine and finding that guarantors, unlike debtors, could waive notice through a pre-default agreement). In the documents entered into by Car America and Barnette, they did not waive the notice requirement, nor did they sign or authenticate them after either financing was denied or the car was repossessed. Moreover, Barnette, as a debtor, retained an interest, at least to the extent that she had a right of redemption, *see* Va.Code Ann. § 8.9A–623(c)(2), in the car after Car America repossessed it. *See Moffett*, 356 F.3d at 524. Thus, Car America must have provided Barnette notice prior to disposition of the car. The Defendant concedes that it did not. Accordingly, the Court grants summary judgment to Barnette on the UCC claim.

Article Nine sets statutory damages for violation of its provisions as "the time-price differential plus ten percent of the cash price." Va.Code Ann. § 8.9A–625(c). Without elaborating as to the terms of the statute or citing relevant caselaw, Barnette asserts that her liquidated damages were the total finance charge stated on the RISC ($7,515.97) plus 10 percent of the amount financed (10% of $13,507.43), amounting to $8,866.71. The Defendant did not contest this calculation or even address damages. Accordingly, the Court will order additional briefing on this issue.

### IV. Conclusion

For the foregoing reasons, the Court grants in part and denies in part the Motions for Summary Judgment.

An appropriate Order shall issue.

### ORDER

Before the Court are the parties' Motions for Summary Judgment. In accordance with the accompanying Memorandum Opinion, the Court:

1. GRANTS the Defendant's Motion for Summary Judgment ("Defendant's Motion") (Docket No. 50) and DENIES the Plaintiff's Motion for Summary Judgment ("Plaintiff's Motion") (Docket No. 64) as to the ECOA Claim (Count 1);

2. GRANTS the Plaintiff's Motion as to the FCRA Claim (Count 2), reserving the issues of the nature of the violation and damages for trial;

3. GRANTS the Plaintiff's Motion and DENIES the Defendant's Motion as to the UCC Claim (Count 7);

4. DIRECTS that the parties shall submit briefs of no more than three (3) pages and any supporting documentation on the issue of the amount damages under the UCC Claim within five (5) days of the entry of this Order

5. DISMISSES WITH PREJUDICE the Plaintiff's conversion and breach of contract claims; and

6. DENIES as moot Plaintiff's Motion to Strike (Docket No. 63).

Let the Clerk send a copy of this Order and the accompanying Memorandum Opinion to counsel of record for the Plaintiff and the Defendant.

And it is so ORDERED.