**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

CAPITOL INDEMNITY CORPORATION,
          *Plaintiff-Appellee,*

v.

BALJIT S. AULAKH; PAVITAR P.
AULAKH,
        *Defendants-Appellants,*      No. 02-1160

        and

SUPERIOR MANAGEMENT SERVICES,
INCORPORATED,
        *Defendant.*

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Claude M. Hilton, Chief District Judge.
(CA-01-1068-A)

Argued: October 30, 2002

Decided: December 12, 2002

Before WIDENER, WILLIAMS, and MOTZ, Circuit Judges.

Affirmed by published opinion. Judge Motz wrote the opinion, in
which Judge Widener and Judge Williams joined.

## COUNSEL

**ARGUED:** Daniel Mark Press, CHUNG & PRESS, P.C., McLean,
Virginia, for Appellants. Brian Paul Waagner, WICKWIRE GAVIN,

P.C., Vienna, Virginia, for Appellee. **ON BRIEF:** Russell B. Adams, III, CHUNG & PRESS, P.C., McLean, Virginia, for Appellants. Edward G. Gallagher, WICKWIRE GAVIN, P.C., Vienna, Virginia, for Appellee.

---

**OPINION**

DIANA GRIBBON MOTZ, Circuit Judge:

The district court granted summary judgment to Capitol Indemnity Corporation on its claim that Baljit S. Aulakh and his wife, Pavitar Aulakh, breached an indemnity agreement they had entered into with Capitol Indemnity pursuant to a surety bond. The Aulakhs appeal, contending that the indemnification agreement cannot be enforced against one or both of them because Capitol required Pavitar Aulakh to sign the agreement in violation of the Equal Credit Opportunity Act and its Virginia counterpart. Because a surety bond does not constitute a credit transaction under these statutes, we affirm the district court's grant of summary judgment to Capitol.

I.

The parties do not dispute the following facts. Baljit Aulakh is the president and sole shareholder of Superior Management Services, Incorporated ("SMS"), a Maryland corporation in the construction business. Pavitar Aulakh is Baljit Aulakh's wife.

Capitol Indemnity Corporation ("Capitol") is an insurance company authorized to write surety bonds in the Commonwealth of Virginia. By means of a surety bond, a surety (in this case, Capitol) agrees to protect the obligee if the principal (SMS) defaults in performing the principal's contractual obligations. The bond is the instrument that binds the surety. *See* Black's Law Dictionary 181 (6th ed. 1990).

On January 2, 1998, the Aulakhs executed an indemnity agreement with Capitol obligating them to indemnify the insurer for losses and expenses incurred by Capitol in providing surety bonds for SMS proj-

ects. Following the execution of the indemnity agreement, Capitol issued various performance and payment bonds as surety for SMS construction projects. SMS later defaulted on a series of contracts involving work at Bolling Air Force Base. In paying out on the applicable surety bonds, Capitol incurred $92,594 in losses and expenses.

Accordingly, Capitol filed this indemnity action seeking judgment against SMS, Baljit S. Aulakh, and Pavitar Aulakh, jointly and severally, for the amount of its losses, as well as attorney's fees and costs. SMS and the Aulakhs responded initially by questioning whether Capitol incurred its losses in good faith. After deposing Capitol's corporate designee, they conceded the point.

Capitol then moved for summary judgment. SMS admitted liability for the full amount of Capitol's claim. The Aulakhs, however, contended that the indemnity agreement was unenforceable as to one or both of them because Pavitar Aulakh's signature had been secured in violation of the Federal Equal Credit Opportunity Act, 15 U.S.C. § 1691 et seq. (1998) ("ECOA"), and its Virginia analogue, the Virginia Equal Credit Opportunity Act, Va. Code Ann. § 59.1-21.19 et seq. (2001) ("Virginia ECOA"). They argued that because Pavitar Aulakh had no involvement in the business of SMS, other than the fact that she was married to its sole shareholder, Capitol's requirement that she sign the indemnity agreement constituted credit discrimination under the equal credit opportunity statutes. The district court granted summary judgment to Capitol, ruling that neither the ECOA nor the Virginia ECOA applied to the transaction underlying Capitol's indemnity claim.

## II.

This case presents an issue of first impression in the federal appellate courts: whether the ECOA and its state analogues apply to surety bonds.

By their terms, these statutes only govern credit transactions between statutorily-defined credit applicants and creditors. The animating principle of the ECOA and its state analogues is to prevent discrimination against those applying for credit. As such, they contain broad anti-discrimination provisions that "make it unlawful for any

creditor to discriminate against any applicant with respect to any credit transaction on the basis of race, color, religion, national origin, sex or marital status, or age." 15 U.S.C. § 1691(a)(1); Va. Code Ann. § 59.1-21.21:1(a)(1).

In explicitly identifying "sex or marital status" as one of the prohibited bases for discrimination in credit transactions, legislatures sought to eradicate credit discrimination against women, particularly married women with whom creditors traditionally had refused to deal. *See Markham v. Colonial Mortgage Service Co.*, 605 F.2d 566, 569 (D.C. Cir. 1979) (stating that "one, perhaps even the main, purpose of the [ECOA] was to eradicate credit discrimination waged against women, especially married women whom creditors traditionally refused to consider apart from their husbands as individually worthy of credit"); *see also Riggs Nat'l Bank v. Linch*, 36 F.3d 370, 374 (4th Cir. 1994). Regulations implementing the ECOA offer explicit guidance in this respect. *See* 12 C.F.R. § 202.7(d)(1) (2002) ("Except as provided in this paragraph, a creditor shall not require the signature of an applicant's spouse . . . on any credit instrument if the applicant qualifies under the creditor's standards of creditworthiness for the amount and terms of the credit requested."). Therefore, since Capitol has not offered any reason why requiring Ms. Aulakh to sign the indemnity agreement would not have violated the ECOA and the Virginia ECOA if those statutes governed the agreement, summary judgment to Capitol was only appropriate if the equal credit statutes did not apply here.

Resolution of this question turns on whether the surety bond arrangement between SMS and Capitol (and the issuance of surety bonds in general) qualifies as a "credit transaction" under the terms of the equal credit statutes, thus triggering the anti-discrimination provisions. Both statutes define "credit" as "the *right granted by a creditor to a debtor to defer payment* of debt or to incur debts and defer its payment or to purchase property and services and defer payment therefor." 15 U.S.C. § 1691a(d); Va. Code Ann. § 59.1-21.20(b) (emphasis added). The statutes define a "creditor," in relevant part, as "any person who regularly arranges for the extension, renewal, or continuation of credit." 15 U.S.C. § 1691a(e); Va. Code Ann. § 59.1-21.20(c). Finally, a "credit transaction" is defined as "every aspect of an applicant's dealings with a creditor regarding an application for

credit or an existing extension of credit." 12 C.F.R. § 202.2(m) (2002).

These provisions read together make clear that the essence of the "credit" relationship under the equal credit statutes is one that provides a right to defer payment on a debt or other obligation. This conclusion finds ample support in the case law. *See, e.g.*, *Riethman v. Berry*, 287 F.3d 274, 277 (3d Cir. 2002) ("The hallmark of 'credit' under the ECOA is the right of one party to make deferred payment."); *Shaumyan v. Sidetex Co.*, 900 F.2d 16, 18 (2d Cir. 1990) ("[I]t is apparent that the ECOA extends only to instances in which the right to defer payment of an obligation is granted. Absent a right to defer payment for a monetary debt, property or services, the ECOA is inapplicable.").

The Aulakhs argue that because the "surety, through the issuance of a surety bond, 'arranges' for subcontractors and suppliers to extend 'credit' to the principal," the surety falls within the ECOA's definition of creditor. Brief of Appellants at 10. Although they admit that "the bonds do not necessarily extend the 'right' to incur debt and defer payment beyond a subcontractor or supplier's payment terms," they contend that "the bond gives the principal the right to incur debt to subcontractors and suppliers that is not C.O.D. or paid in advance, a right that the principal would not have without the surety bond." *Id*. Consequently, the Aulakhs claim, surety bonds effectively function as "credit transactions" under the ECOA. *Id*. According to this line of reasoning, indemnity agreements executed in conjunction with and as a requirement for the issuance of surety bonds thus qualify as aspects of "credit transactions" and are subject to the anti-discrimination provisions of ECOA.

The problem with this argument is that nothing in the surety bond transaction or the indemnity agreement entitles anyone to defer payment of any debt or other obligation, a *sine qua nom* of coverage under the equal credit statutes. As noted above, the ECOA and its Virginia counterpart define "credit" as "the right granted by a creditor to a debtor" to defer payment of a debt or other obligation. Construing the transactions at issue in this case as credit transactions under these statutes would thus require that Capitol grant a right to SMS to defer payment. While the surety bond may indeed have allowed SMS to

negotiate different contractual obligations and payment terms with its suppliers and sub-contractors, it did not give SMS any sort of right to defer payment.

Instead, the surety bond simply provided that in the event that SMS defaulted on its contractual obligations, Capitol would take the place of SMS and satisfy those obligations. By virtue of the indemnity agreement, Capitol could then proceed against SMS and the Aulakhs for indemnification from the losses and expenses incurred as a result of paying out the surety bond. In effect, the surety bond together with the indemnity agreement worked to allocate the default risk associated with various contractual obligations incurred by SMS in the course of its construction business. This was not an instrument that allowed for any sort of deferral or restructuring of debt payments. The underlying cash flows attached to the specific contract would simply continue apace. Indeed, the surety bond worked to ensure that there was no interruption or deferral of these cash flows. It operated as an insurance instrument rather than a debt or credit instrument.

We hold, therefore, that the issuance of surety bonds does not constitute a credit transaction as defined under the ECOA and the Virginia ECOA. Neither Congress nor the Virginia legislature exhibited any intent for parties to use these statutes to escape liability from valid contractual obligations; and we refuse to sanction such an effort here. SMS needed surety bonds in order to engage in construction projects at Bolling Air Force base. *See* 40 U.S.C. § 270(a) (2001) (the "Miller Act") (current version at 40 U.S.C. § 3131 (West, Westlaw current through P.L. 107-278, approved Nov. 5, 2002)). Capitol provided those surety bonds, thereby ensuring that the contractual obligations incurred by SMS in its construction projects would be met. In return, Capitol required that SMS and the Aulakhs sign an indemnity agreement, guaranteeing payment for losses and expenses incurred as a result of any default by SMS and subsequent pay out of the surety bonds by Capitol. Each side obtained exactly what it sought.

We note that this conclusion comports with the view of the two district courts that have addressed the issue. *See Cincinnati Ins. Co. v. Smigiel*, 1997 U.S. Dist. LEXIS 6694, at *6-*10 (E.D. Mich. Mar. 20, 1997) (rejecting a claim that ECOA applied to surety's indemnity claim); *Universal Bonding Ins. v. Esko & Young, Inc.*, 1991 WL

30049, at *3 (N.D. Ill. Feb. 28, 1991) (rejecting a claim that ECOA applied to suretyship promise on grounds that the contract extended no right to defer payment on debt or other obligation). Both of those cases involved a surety's claim for indemnification against corporate and individual indemnitors, including a husband and wife who had signed the indemnity agreement. In both cases, the wife sought to escape liability through alleged violations of the anti-discrimination provisions of the ECOA. And in both cases, the court granted summary judgment to the surety, holding that the ECOA does not apply to the execution of an indemnity agreement executed in conjunction with a surety bond. *See also Connecticut Indem. Co. v. Ashworth*, 1997 Me. Super. LEXIS 60, at *6-8 (Me. Super. Feb. 21, 1997) (same result).

Our holding should not be read to suggest that the issuance of surety bonds can never operate as a "credit transaction" as defined in a different statute or as understood in a different set of circumstances. Rather, we simply conclude that under the definition of credit provided in the ECOA, specifically the right to defer payment on a debt, the issuance of surety bonds does not qualify as a credit transaction. Given the sophistication of modern capital markets, virtually all financial instruments have an inherent plasticity that allows them to operate in a variety of capacities. The linkages between insurance and debt markets, moreover, render suspect any attempt to develop a precise rule that separates such instruments into one category or another. The law forever plays catch-up with the capital markets. This creates all the more reason to adhere closely to statutory language in deciding individual disputes such as the one at hand.

III.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED*.