292 F.Supp.2d 1181 (2003)
Albert M. BAYARD, Plaintiff,
v.
BEHLMANN AUTOMOTIVE SERVICES, INC., et al., Defendants.
No. 4:02 CV 01298 AGF.
United States District Court, E.D. Missouri, Eastern Division.
November 7, 2003.
*1182 *1183 Mitchell B. Stoddard, St. Louis, MO, for Plaintiff.
Daniel E. Wilke, Kathy M. Wilke, Wilke and Wilke, P.C., St. Louis, MO, for Defendant.

MEMORANDUM OPINION
FLEISSIG, United States Magistrate Judge.
This matter is before the Court for disposition following a bench trial.[1] Plaintiff Albert Bayard brings this action under the Equal Credit Opportunity Act (ECOA), 15 U.S.C. § 1691, et seq., against Behlmann Automotive Services, Inc. (Behlmann). Bayard claims that Behlmann violated his rights under the ECOA by failing to provide him with a written statement of reasons for the denial of his credit application. He seeks injunctive relief, punitive damages, *1184 and attorney's fees.[2] For the reasons set forth below, the Court will grant Bayard injunctive relief and $100.00 in statutory punitive damages. Plaintiff is also entitled to reasonable attorney's fees.

FINDINGS OF FACT
The facts of this case are largely undisputed. On April 5, 2002, Bayard entered into an agreement with Behlmann, an automotive dealer, for the purchase of a vehicle for $40,004.50. (Pl.'s Ex. 4).[3] The contract is entitled: "Retail Instalment Sale Contract / GMAC Flexible Finance Plan," and lists Bayard as "Buyer" and Behlmann as "Creditor (Seller)." Behlmann gave Bayard $4,100 for a trade-in, and, in accordance with its usual practice and procedure when a customer seeks to finance a purchase, assisted Bayard in filling out a GMAC application for credit to finance the remainder of the purchase price. At the time, GMAC was offering an annual percentage rate (APR) of 3.9% to qualified buyers. Behlmann provided Bayard with a GMAC credit application, helped him fill out the application, obtained a copy of his credit report, and faxed his credit report and credit application to GMAC. It was the understanding of all parties concerned that Bayard was applying for credit at the 3.9% APR.
Bayard took delivery of the vehicle the same day. The Retail Buyers Order (Def.'s Ex. A) signed by plaintiff included the following terms:
I agree that the sale of this vehicle is subject to and conditioned upon approval by a third party lender, and that dealer does not intend or agree to finance the sale of this vehicle.
If I accept delivery of this vehicle prior to final approval of credit, and financing is not approved within 72 hours ... I agree to return the vehicle to dealer within 24 hours after notice.
On April 6, 2002, GMAC notified Behlmann that it had denied Bayard's credit application. Pl.'s Exh. 5. A Behlmann employee, Patricia Beckham, called GMAC to try to get credit for Bayard. Beckham assumed that she pointed out the credit applicant's strong points, such as his or her occupation or stability. Based upon Beckham's call, GMAC agreed to finance Bayard's purchase at an APR of 10.9%, and on April 19, 2002, Behlmann called Bayard and told him that he had been denied credit at 3.9% but that GMAC would extend him credit at 10.9%. Bayard declined these terms and returned the vehicle to Behlmann.
On August 27, 2002 Bayard filed this action, claiming that Behlmann and GMAC violated the ECOA by failing to provide him with written a statement within 90 days of April 19, 2002, of the reasons his application for credit at 3.8%[4] was denied. GMAC settled Bayard's claim against it. Bayard now seeks punitive damages against Behlmann, and injunctive relief in the form of an order requiring Behlmann to establish reasonable procedures to assure compliance with the statute in the future. Bayard also seeks attorney's fees.[5]

*1185 CONCLUSIONS OF LAW
The purpose of the ECOA is to prevent discrimination against those applying for credit. As such, it contains broad antidiscrimination provisions that "make it unlawful for any creditor to discriminate against any applicant with respect to any credit transaction on the basis of race, color, religion, national origin, sex or marital status, or age." 15 U.S.C. § 1691(a)(1); see also Capitol Indem. Corp. v. Aulakh, 313 F.3d 200, 202 (4th Cir.2002). The ECOA also contains notice requirements, providing that an applicant for credit "against whom an adverse action is taken shall be entitled to a statement of reasons for such an action from the creditor." Id. § 1691(d). An aggrieved applicant may bring a civil action against "any creditor who fails to comply with any requirement imposed under [the Act]." Id. § 1691e.
The ECOA delegated to the Federal Reserve Board (FRB) the power to implement regulations in furtherance of carrying out the Act's purpose. Id. § 1691b(a). These regulations, known as "Regulation B," are found under 12 C.F.R. §§ 202.1-202.15. Regulation B provides that the statement mandated by § 1691(d) of the Act must be in writing, and when a counteroffer of credit is made, the statement must be given "within 90 days after notifying the applicant of a counteroffer if the applicant does not expressly accept or use the credit offered." 12 C.F.R. § 202.9(a)(iv).
Behlmann first argues that it is not a "creditor" as that term is defined by the ECOA and Regulation B. Behlmann maintains that its name appears as "Creditor (Seller)" on the Retail Instalment Sale Contract for purposes of another federal statute, and the Court agrees with Behlmann that this nomenclature has little bearing on the issues in this case.
The ECOA defines a "creditor" as "any person who regularly extends, renews, or continues credit; any person who regularly arranges for the extension, renewal, or continuation of credit; or any assignee of an original creditor who participates in the decision to extend, renew, or continue credit." 15 U.S.C. § 1691a(e). Under this language, it appears that Behlmann would be considered a creditor as one who regularly arranges for the extension of credit. The regulations, however, define "creditor" differently for different portions or purposes of the Act. The version of Regulation B in effect at the time of the transaction in this case defined "creditor" as:
a person who, in the ordinary course of business, regularly participates in the decision of whether or not to extend credit.... For purposes of §§ 202.4 [prohibiting discrimination in credit decisions] and 202.5(a) [prohibiting discriminatory discouragement of applying for credit], the term also includes a person who, in the ordinary course of business, regularly refers applicants or prospective applicants to creditors, or selects or offers creditors to whom requests for credit may be made.
20 C.F.R. § 202.2(l) (Jan.2002). Comment 2 to § 202.2(l) explained:
For certain purposes, the term creditor includes persons such as real estate brokers who do not participate in credit decisions but who regularly refer applicants to creditors or who select or offer to select creditors to whom credit requests can be made. These persons must comply with § 202.4, the general *1186 rule prohibiting discrimination, and with § 202.5(a), on discouraging applications.
Id. Supp. I (Official Staff Interpretations).
Effective April 15, 2003, § 202.2(l) was revised in that the first sentence was changed to define creditor as "a person who, in the ordinary course of business, regularly participates in a credit decision, including setting the terms of the credit." 68 Fed.Reg. 13144, 13155 (March 18, 2003). The comment to this new definition states as follows:
For certain purposes, the term creditor includes persons such as real estate brokers, automobile dealers, home builders, and home-improvement contractors who do not participate in credit decisions but who only accept applications and refer applicants to creditors, or select or offer to select creditors to whom credit requests can be made. These persons must comply with § 202.4(a), the general rule prohibiting discrimination, and with § 202.4(b), the general rule against discouraging applications.
12 C.F.R. Pt. 202, Supp. I (March 2003).
The FRB elaborated on this comment, as follows:
Comment 2(1)-2 has been revised to clarify the type of creditors subject only to the general prohibitions against discrimination in §§ 202.4(a) and (b), respectively.
Some industry commenters expressed concern that the clarification would include in the definition of creditor persons without discretion to decide whether credit will be extended. The Board recognizes that in the credit application process persons may play a variety of roles, from accepting applications through extending or denying credit. Comment 2(1)-2 is intended to clarify that where the only role a person plays is accepting and referring applications for credit, or selecting creditors to whom applications will be made, the person meets the definition of creditor, but only for purposes of the prohibitions against discrimination and discouragement. For example, an automobile dealer may merely accept and refer applications for credit, or it may accept applications, perform underwriting, and make a decision whether to extend credit. Where the automobile dealer only accepts applications for credit and refers those applications to another creditor who makes the credit decisionfor example, where the dealer does not participate in setting the terms of the credit or making the credit decisionthe dealer is subject only to §§ 202.4(a) and (b) for purposes of compliance with Regulation B.
68 Fed.Reg. 13155 (March 18, 2003).
The regulatory definition of "creditor" in effect at the relevant time, and the agency interpretation thereof, suggest a continuum of participation in a credit decision from no participation, to referring applicants to the decision maker, to final decision making. At some point along the continuum, a party becomes a creditor for purposes of the notification requirements of the Act. Here, the Court concludes, based upon the record before it, that Behlmann's activities in relation to the credit decision in this case placed Behlmann at a point on the continuum where it "participate[d] in the decision of whether or not to extend credit" to Bayard.
Behlmann argues that even if in this case it participated in the credit decision, Bayard failed to show that Behlmann "regularly" does so, as required under § 202.2(1). In this case, however, the parties offered no testimony from GMAC as to its practices and little evidence regarding the relationship between GMAC and Behlmann with regard to their respective practices. The only evidence offered was selected pages of Ms. Beckham's deposition testimony. The Court concludes that *1187 Ms. Beckham's deposition testimony establishes that Behlmann's actions in this case were in accordance with its regular practices. On this record, therefore, the Court concludes that plaintiff has established in this case that Behlmann was a "creditor" subject to the notification requirements of § 202.9(a). Other district courts have held, in similar circumstances, that an automobile dealer was a creditor for purposes of these requirements. See, e.g., Cannon v. Metro Ford, Inc., 242 F.Supp.2d 1322, 1330-31 (S.D.Fla. Dec. 23, 2002); Mungia v. Tony Rizza Oldsmobile, Inc., 2002 WL 554504, at *1 (N.D.Ill. April 15, 2002).
The Court believes that the same result is reached applying Regulation B's new definition of "creditor," and the agency's new comment and explanation. These clarify that persons who are "creditors" for other provisions of the ECOA are not subject to the Act's notification requirements if they "merely accept and refer credit applications." The record before the Court establishes that Behlmann did more than that for its customers who wished to finance the purchase of a vehicle.
Behlmann next argues that even if it was a "creditor" for purposes of the notification requirements, it had no obligation to provide Bayard a written statement of the reasons for the credit decision, because that decision was not an "adverse action." The ECOA defines "adverse action" as "a denial or revocation of credit, a change in the terms of an existing credit arrangement, or a refusal to grant credit in substantially the amount or on substantially the terms requested." 15 U.S.C. § 1691(d)(6). Behlmann relies on the fact that the credit application did not specify an APR of 3.9%, but rather sought credit "at the lowest rate available." Thus, Behlmann argues, there was no refusal to grant credit on the terms requested. The Court concludes that this argument is without merit. The credit application is silent as to the rate. Based upon the evidence presented, the Court finds that it was understood by all concerned parties that Bayard was applying for credit at an APR of 3.9%.
The Court next turns to the question of punitive damages. The ECOA provides for punitive damages, as follows:
Any creditor ... who fails to comply with any requirement imposed under this subchapter shall be liable to the aggrieved applicant for punitive damages in an amount not greater than $10,000, in addition to any actual damages.... In determining the amount of such [punitive] damages, the court shall consider, among other relevant factors, the amount of actual damages awarded, the frequency and persistence of failures of compliance by the creditor, the resources of the creditor, the number of persons adversely affected, and the extent to which the creditor's failure of compliance was intentional.
15 U.S.C. § 1691a(b).
In Anderson v. United Finance Co. 666 F.2d 1274 (9th Cir.1982), the Ninth Circuit held that "[a]lthough the word `shall' is used, § 1691e(b) does not require an award of punitive damages for every violation of the Act." Id. at 1278 (citing Shuman v. Standard Oil Co., 453 F.Supp. 1150, 1152 n. 1 (N.D.Cal.1978)) ("The court does not interpret the use of the word `shall' in this section to mean that punitive damages must be awarded for every violation of the ECOA without regard to the seriousness of the violation or the reason therefore."). The Court agrees with this interpretation of the statute. The concept of damages as "punitive" implies some degree of blame beyond a technical violation of the statute.
Plaintiffs need not prove actual damages or demonstrate willful violation of *1188 the ECOA's provisions in order to recover punitive damages. Id. Rather, courts have required plaintiffs to meet a less demanding "reckless disregard" standard in proving entitlement to punitive damages. See Sayers v. GMAC, 522 F.Supp. 835, 841-842 (D.C.Mo.1981) (§ 1691a(b) "has been interpreted to require a minimum finding that the creditor acted in reckless disregard of the requirements of the law. The Court does not need to find that the defendant acted maliciously, wantonly, or oppressively.") (internal citation omitted).
Behlmann argues that it reasonably relies on GMAC to send out the statement of reasons required by the ECOA, and that this hardly qualifies as reckless disregard of the law. It is clear that an applicant for credit is entitled to only one statement of reasons for an adverse action even if multiple parties participated in the credit decision. See Leguillou v. Lynch Ford, Inc., 2000 WL 198796, at *5 (N.D.Ill.2000). The Court concludes, however, that Behlmann's primary position that it is not a creditor for purposes of the notification requirements of the ECOA constitutes reckless disregard of the law. A fair reading of the statute and regulations in effect at the time of the transaction in this case should have alerted Behlmann to its obligations in this regard.
Considering the factors set forth in § 1691a(b), the Court concludes that punitive damages are appropriate here, but only in the amount of $100.00. Bayard sustained no actual damages and presented no proof as to the frequency and persistence of failures by GMAC to provide the required statement, thereby putting the obligation upon Behlmann. It is not enough, as plaintiff suggests, merely to assert that Behlmann never sent notices. As even plaintiff concedes, only one written notice of a denial is required, and there is nothing in this record to suggest that GMAC failed to provide the necessary notification in any other case. Plaintiff has also failed to present evidence of persons adversely affected by Behlmann's noncompliance with the Act, other than himself. The Court further concludes that the extent to which Behlmann's failure of compliance was intentional does not warrant punitive damages in excess of $100.00 in this case.
Parties aggrieved by a creditor's noncompliance with the notification requirements of the ECOA are also entitled to injunctive relief. 15 U.S.C. § 1691e(c). The Court concludes that the form of such relief requested by plaintiff at the bench trialan order requiring Behlmann to adopt reasonable procedures to ensure its compliance with the ECOAis appropriate. Lastly, Behlmann is entitled to attorney's fees under 15 U.S.C. § 1691e(d).
Accordingly,
IT IS HEREBY ORDERED that plaintiff is entitled to punitive damages in the amount of $100.00.
IT IS FURTHER ORDERED that defendant Behlmann shall adopt reasonable procedures to ensure its compliance with the notification requirements of the ECOA.
IT IS FURTHER ORDERED that plaintiff is entitled to reasonable attorney's fees. Plaintiff shall have 30 days from the date of this order to submit a properly-documented request for such fees. Defendant Behlmann shall have 20 days thereafter to file any objections it may have to the request.
An appropriate judgment shall accompany this Memorandum and Order.
NOTES
[1] The parties elected to submit the case upon the written record and oral presentation by counsel.
[2] Although the complaint seeks actual damages, as well as relief under the Missouri Merchandising Practices Act, plaintiff stated at the bench trial that he was not pursuing these remedies.
[3] The only copy of the contract filed with the Court bears a date of April 20, 2002, and is signed by Bayard, but not Behlmann. Neither party could explain the April 20, 2002 date on the contract. The Court finds that the terms on this contract reflect the agreement between the parties.
[4] Although the complaint references 3.8%, the documents and testimony all reference a rate of 3.9%.
[5] Bayard's complaint also seeks actual damages, as well as relief under the Missouri Merchandising Practices Act (MMPA), however he stated at the bench trial that he was no longer seeking actual damages or relief under the MMPA.