**Juan L. PADIN, Plaintiff,**

v.

**OYSTER POINT DODGE, Defendant.**

**No. 3:04–CV–501 DWD.**

United States District Court,
E.D. Virginia,
Richmond Division.

March 3, 2005.

Leonard Anthony Bennett, Leonard A. Bennett, P.C., Christopher C. North, Newport News, VA, for Plaintiff.

John Carl Valdivielso, Kaufman & Canoles, Williamsburg, VA, for Defendant.

## MEMORANDUM OPINION

DOHNAL, United States Magistrate Judge.

This matter is before the court on several motions, dispositive and otherwise. The sole remaining defendant, Oyster Point Dodge, Inc. (Defendant or Oyster Point), is seeking summary judgment on all remaining claims while the Plaintiff seeks partial summary judgment on several, but not all of his claims, and—most recently—reinstatement of one of the claims (unlawful conversion) that had been dismissed earlier by the district court (J. Hudson) before the matter was transferred to this court.[1] The claims involve the alleged violation of the Equal Credit Opportunity Act (ECOA)[2] for the failure of Oyster Point to provide the Plaintiff with notice of an adverse credit action (Count One); violation of the Fair Credit Reporting Act (FCRA)[3] for Oyster Point's failure to send the Plaintiff notice of each credit denial or, in the alternative, any notices that were sent were inadequate and Oyster Point willfully or negligently obtained a copy of the Plaintiff's credit report without a permissible purpose (Count Two); violation of the Truth In Lending Act (TILA)[4] for Oyster

---

**1.** Additional defendants were dismissed by agreement and Counts Six (breach of contract) and Count Seven (unlawful conversion) were dismissed on motion of the Defendant pursuant to Fed.R.Civ.P. 12(b)(6). (Order, Sept. 17, 2004).

**2.** 15 U.S.C. § 1691(d)(2)(b).

**3.** 15 U.S.C. § 1681(b)(f), m.

**4.** 15 U.S.C. §§ 1638, 1640.

Point's failure to make sufficient disclosure of credit terms and conditions and to provide them in adequate written form to the Plaintiff before he became contractually obligated (Count Three); violation of the Virginia Consumer Protection Act (VCPA)[5] for Oyster Point's deliberate and willful deception of the Plaintiff in falsely telling him that financing had been approved (Count Four); common law fraud by Oyster Point in its intentional misrepresentations to the Plaintiff that he was the owner of the car and that financing had been approved, false representations on which the Plaintiff relied to his detriment in various ways (Count Five); and failure of Oyster Point to comply with the mandatory default notice and disposition requirements of state law in conjunction with its repossession of the vehicle (Count Eight). For the reasons set forth herein, the court concludes that both Oyster Point's motion for summary judgment and the Plaintiff's motion for partial summary judgment must each be granted in part and denied in part and that the Plaintiff's motion for relief from judgment as to Count Seven must be denied.

### Undisputed Facts and Reasonable Inferences (Findings)

The court deems the following to constitute the undisputed facts and/or reasonable inferences upon which the pending motions can be resolved:

1. The Plaintiff went to the Defendant's automobile sales lot on February 14, 2004, for the purpose of purchasing a used car. (Pl.'s Mem. Supp. Mot. Partial Summ. J. ¶ 1 (Pl.'s Mem.) (docket entry no. 56); Oyster Point's Mem. Supp. Mot. Summ. J. at (2) (Def.'s Mem.) (docket entry no. 54));[6]

2. The Plaintiff told a salesman[7] that he was interested in a vehicle for which the monthly financed payment would not exceed $250. (Pl.'s Mem. ¶; Def.'s Mem. at 2);

3. The Plaintiff indicated that he wanted to trade-in his old car and have the new purchase financed through the Defendant. (Pl.'s Mem. ¶ 2; Def.'s Mem. at 3, 13–14);

4. The Plaintiff provided the Defendant with personal information relevant to his credit application. (Pl.'s Mem. ¶ 3);

5. The Defendant obtained the Plaintiff's credit report with his prior knowledge and consent for use in the credit application process. (Pl.'s Mem. ¶ 6; Def.'s Mem. at 13–14);

6. A Buyer's Order form was used as a worksheet by the salesman to ascertain and discuss some of the specifics of the proposed transaction with the Plaintiff. (Pl.'s Mem. ¶ 8; Oyster Point's Reply Pl.'s Mot. Partial Summ. J. ¶ 8 (Def.'s Reply Mem.) (docket entry no. 60));

7. The Defendant input Plaintiff's pertinent information (but not his credit report) into an on-line computer network ("Dealer Track") and forwarded the information to multiple lenders that the Defendant had selected as possible sources of

---

5. Va.Code § 59.1–200(14).

6. The court will cite to specific portions of the record as well as the parties' respective statements of undisputed fact that have been submitted in compliance with local rule with the understanding that the references incorporate the citations to the discovery record that are noted in the statements.

7. There is a dispute as to which salesman the Plaintiff dealt with, but ultimately the issue is not material to the resolution of the pending motions. (Def.'s Mem. at 2, n.1).

financing for the proposed transaction based on Defendant's assessment of each lender's programs and Plaintiff's financial situation. (Def.'s Mem. at 3–4);

8. One lender, Consumer Portfolio Services (CPS), responded favorably, indicating that it would provide financing at an interest rate of 16.95% ("Buy Rate") and would allow the Defendant to add an additional 2% ("Reserve Rate") for having arranged the transaction with CPS. (Def.'s Mem. at 3);

9. The Defendant did not negotiate with the lender regarding any aspect of the proposal and the Defendant was not asked by any lender, including CPS, to negotiate with the Plaintiff as to any revised proposal in order to obtain the financing, *e.g.*, higher down payment, nor did the Defendant do so on its own initiative;

10. A second Buyer's Order was prepared and a completed Retail Installment Sales Contract (RISC) was presented to the Plaintiff for his review. (Pl.'s Mem. ¶ 8; Def.'s Reply Mem. at 2);

11. The annual percentage rate (APR) as noted in the RISC included the 2% Reserve Rate for a total of 18.95%. (Def.'s Mem., ex. 12);

12. The Plaintiff did not ask for a copy of the RISC to keep before signing it, nor was he told one would be given to him at that juncture if he wanted. (Pl.'s Mem. ¶¶ 9–10; Def.'s Reply Mem. ¶ 11);

13. The Plaintiff signed the RISC without reading it first. (Def.'s Mem. at 4);

14. The Plaintiff was given a copy of the RISC after the transaction was completed. (Pl.'s Mem. ¶ 10);

15. Oyster Point was listed on the RISC as "Creditor–Seller" as it is on all RISCs. (Def.'s Reply Mem. at 3).

16. The Plaintiff was given a list ("stips sheet") of documents he needed to provide the lender to verify the information on his credit application. (Def.'s Mem. at 5, ex. 13);

17. The list included verification of employment income. *Id.;*

18. Both the Plaintiff and Defendant thought financing had been approved and Plaintiff insists that his understanding was confirmed by an agent of the Defendant before he left the dealership. (Def.'s Mem. at 5); [8]

19. The Plaintiff did not visit any other dealerships and had no intention of doing so when he went to the Defendant's lot. (Def.'s Mem. at 5);

20. The Plaintiff requested that the Defendant arrange financing and he had no intention of "shopping" any proposed rate around to other lenders. (Def.'s Mem. at 5);

21. CPS rejected the Plaintiff's credit application almost three weeks later on about March 5, 2004, for the stated reason (in pertinent part) that "job time and income didn't verify as stated … since a com-

---

**8.** There is a dispute about who Plaintiff claims told him the financing was approved which gives rise to Defendant's half-hearted argument that such a comment was never made, but, ultimately, the issue is not a genuine dispute of material fact because even if

the statement was made, it cannot be the basis for a claim of willful and fraudulent misrepresentation where the Defendant caused title to pass to the Plaintiff in a timely fashion without financing having been finally approved. *See* discussion, *infra.*

plete work history was not provided CPS is unable to further consider deal at this time...." (Def.'s Mem. at 5; ex. 14);

22. CPS sent to the Plaintiff a standard-form notice of its adverse action dated March 19, 2004, noting that it had rejected the credit application due to "Credit application/document incomplete." (Def.'s Mem. at 5; ex. 15);

23. The notice also provided that the Plaintiff could request disclosure of the information on which the adverse decision was based by writing to a named representative at an address contained in the notice. (Def.'s Mem., ex. 15);

24. The Defendant did not provide the Plaintiff with any written notice as to the adverse credit decision, including how the Plaintiff could obtain further information as to the underlying reason(s) for the action;

25. The vehicle was titled in Plaintiff's name on March 9, 2004, four days after CPS had denied the credit application by notice to the Defendant and some two weeks before written notice of the adverse action was provided directly to the Plaintiff by CPS (March 19, 2004). (Def.'s Mem., exs. 15, 17);

26. The Plaintiff made his first and only installment payment in the correct amount by check, dated March 15, 2004. (Pl.'s Mem. ¶ 13);

27. The Plaintiff returned to the Defendant's dealership with the vehicle on March 19, 2004, at the request of the Defendant. (Def.'s Mem. at 6);

28. Upon arriving at the dealership on March 19, the Plaintiff was told something to the effect that "the deal had fallen through" and/or that financing had not been finally approved and that the Defendant was "taking the car back." (Pl.'s Mem. ¶¶ 14–15; Def.'s Mem. at 6);

29. The Plaintiff asked about his trade-in and was told it had already been resold. (Pl.'s Mem. ¶ 16; Def.'s Mem. at 6);

30. The Defendant took possession of the car, did not give the Plaintiff written notice of its action or intended disposition; gave the Plaintiff a check for $1000 for the agreed value of his trade-in that had been resold for $800; and the check for the single installment payment Plaintiff had made days earlier was returned to him separately by CPS. (Def.'s Mem. at 6);

31. CPS released its lien that had been noted on the vehicle title as of April 6, 2004, and the vehicle was intended for resale as "used" because title remained in the Plaintiff's name. (Def.'s Mem. at 6–7);

32. The Plaintiff did not suffer any actual economic damages, including being subsequently denied credit as a result of the failed transaction, although he claims a host of non-economic injuries. (Def.'s Mem. at 6–7; Pl.'s Opp'n at ¶ 5).

## Analysis

### Count One (ECOA)

ECOA was enacted in 1974 to prohibit discrimination in credit transactions and it was subsequently amended in 1976 to require those making credit decisions to provide the consumer-applicant with timely notice (within thirty days) of any adverse decision that would be specific enough to inform the consumer of the reasons for the adverse action. *Treadway v. Gateway*

*Chevrolet Oldsmobile, Inc.*, 362 F.3d 971, 975 (7th Cir.2004) (citing *Fischl v. General Motors Acceptance Corp.*, 708 F.2d 143, 146 (5th Cir.1983) to the effect that 15 U.S.C. § 1691(d)(2) and (3) requires a statement of the specific reasons for the adverse action taken). Accordingly, a key issue in this case is who or what constitutes a "creditor" obliged to provide such notice. In an effort to presumably clarify the situation, the agency that has governing authority over the statutory scheme involved, the Board of Governors of the Federal Reserve (Board),[9] promulgated official commentary in March 2003 which states in pertinent part:

> *Referrals to creditors.* For certain purposes, the term creditor includes persons such as real estate brokers, automobile dealers, home builders, and home-improvement contractors who do not participate in credit decisions but who only accept applications and refer applicants to creditors, or select or offer to select creditors to whom credit requests can be made. These persons must comply with § 202.4(a), the general rule prohibiting discrimination, and with § 202.4(b), the general rule against discouraging applications.

Official Staff Commentary to Revised Reg. B, 68 Fed.Reg. 13,188 (Mar. 18, 2003); 12 C.F.R. pt. 202.I (Jan. 1, 2004).

Thus, although one who merely "refers applicants or prospective applicants to creditors, or selects or offers to select creditors to whom requests for credit can be made" (so-called "referral creditors") are to be considered as creditors for some purposes in the statutory scheme, the question is whether such a party also has the obligation to send notice of any adverse action to the consumer. Reg. B, 12 C.F.R. § 202.2(1); (Pl.'s Opp'n Def.'s Summ. J. Mot. & Pl.'s Sep. Listing Disp. Facts & Pl.'s Reply Supp. of Mot. Partial Summ. J. at 14) (Pl.'s Opp'n)(docket entry no. 64).

The Seventh Circuit in *Treadway* sets forth a persuasive analysis of the relevant issues. Specifically, it identified and analyzed the issue in terms of what activities a party engages in along the "continuum of participation in a credit decision from no participation, to referring applicants to the decision maker, to final decision making. At some point along the continuum, a party becomes a creditor for purposes of the notification requirements of the Act." *Treadway*, 362 F.3d at 980 (citing *Bayard v. Behlmann Auto. Servs., Inc.*, 292 F.Supp.2d 1181, 1186 (E.D.Mo.2003)). First, the court found that the earlier version of the statutory provision referring to anyone who "regularly refers applicants to lenders" as a creditor (which would include virtually every automobile dealer) only implicated the prohibition in the Act of "discrimination" and "discouragement," not notification. *Id.* at 978–79 (citing 12 C.F.R. § 202.4(a) & (b)). However, as the court also noted, the language has since been amended to include as "creditor" one who "regularly participates in a credit decision, including setting the terms of the credit" by "(a) [insisting] on more money down; (b) [requesting] that the applicant find a cosigner; (c) [lowering] the price of the car in order to lower the loan-to-value ratio;" or (d) "advocating" with the lender to make the loan but at a higher interest rate. *Id.* at 980.[10] Here, the Defendant

---

**9.** 15 U.S.C. § 1691(b) (granting the Board the authority to promulgate regulations and interpretations of ECOA). *See also, Chevron, U.S.A. v. Natural Resources Defense Council,* 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (a governing agency's interpretation must be given deference unless irrational).

**10.** Though the final scenario is not part of the quoted excerpt from *Treadway,* it is clear that

determined which lenders to send the Plaintiff's credit application, but, as *Treadway* holds (citing the Board's interpretative rulings concerning "the common scenario in which an automobile dealership decides to send a credit application to a limited number of the many lenders with which it works"):

> The Federal Reserve Board has clearly indicated that merely "selecting creditors to whom applications will be made" does not make one a "creditor" for purposes of the notice requirements of the ECOA. *See* 68 Fed.Reg. 13155. In that situation, at least one lender is given the opportunity to decide whether to extend credit. Therefore, it is the lender, rather than the dealer, that makes the credit decision... Moreover, if the dealer sends the application to at least one lender, there is another party that can provide notice to the applicant.

*Id.* at 980 n. 8; Findings ¶ 7.

Therefore, although the Defendant exercised its discretion in deciding to whom to "shop" the Plaintiff's credit application, such "participation" alone does not make it a "participating creditor" for purposes of requiring it to abide by the notification provisions in the event of an adverse credit decision.[11] Moreover, the Defendant did not request that the Plaintiff find a cosignor, demand a higher down payment, or negotiate with the Plaintiff to set a higher interest rate. (Findings ¶¶ 7, 9). Nevertheless, there is a remaining aspect of the situation that appears to be dispositive, namely, whether the Defendant participated in "setting the terms of the credit," thereby benefitting from the loan. The court in *Treadway* clearly identifies the situation in which the automobile dealer "gets part of the action" by receiving at least a portion of the interest rate above that which the lender was prepared to charge in order to make the loan:

> If [the dealer] set an APR higher than the rate upon which the lender would otherwise agree to extend credit, [the dealer] and the lender would split the incremental proceeds, known as the "reserve." Therefore, [the dealer] could increase the APR in order to induce the lender to agree to extend credit and in so doing, it was also "setting the terms of the credit" and benefitting from the loan.

*Id.* at 980.

▇ Here, although the lender (CPS) was prepared to grant the loan at the "buy" rate, and the Defendant was apparently prepared to forego the benefit of its piece of the interest pie to "make the deal," the Defendant didn't forego the opportunity to benefit from the additional "reserve" increase and, therefore, it became a "participating creditor" required to give notice to the consumer of any adverse credit decision by virtue of a higher interest rate being charged than would otherwise have been required by the lender. There is no dispute that the Defendant did not provide the required written notice to the Plaintiff that the financing was ultimately denied by CPS and, therefore, even though the lender (CPS) did give notice, the Plaintiff's motion for partial summary judgment as to liability must be granted for the dealer's failure to do so.[12] (Findings ¶ 24).

---

the court considered it as well given its citation to *Bayard* that involved such a circumstance. *Id.*

**11.** Of course, the automobile dealer is still obliged to comply with the general rule pro-

hibiting discrimination and the discouragement of applications. 12 C.F.R. § 202(2), (b).

**12.** The court has difficulty with Plaintiff's alternative argument that the Defendant must be viewed as a creditor subject to the notice

*Count Two (FCRA)*

The FCRA focuses on the accuracy of credit reports that are utilized in making the credit decisions for which notice must be provided, as well as how such reports are to be accessed. 15 U.S.C. § 1681(a)(1) ("[i]naccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.").[13] Although ECOA and FCRA have related notice requirements, they serve different purposes with different proscriptions. Pursuant to the FCRA, a "user" can only access a consumer's credit report for a "permissible purpose" and if the user bases an adverse credit decision on information contained in the report, the user must not only give the consumer notice of the action, but it must also inform the consumer how additional information concerning the underlying reason(s) for the action can be obtained from any third party source ("furnisher"). 15 U.S.C. §§ 1681m(a)-(b).[14]

The FCRA permits a creditor (user) to access a consumer's credit report for any purpose with the consumer's written authorization, *or* for certain purposes specified in the statute in the absence of such express authorization. 15 U.S.C. § 1681. Here, the Plaintiff asserts that the Defendant accessed the Plaintiff's credit report in violation of the FCRA because he did not give his express permission to do so for other than an inquiry regarding possible financing for a particular vehicle (the Kia), while the Defendant obtained the report in regard to two additional cars (the Corolla and the Chevrolet Malibu) that the Plaintiff asserts he was never interested in purchasing. (Pl.'s Opp'n at 20–21). The Defendant responds to the effect that the Plaintiff gave his express permission in not one, but two "broad" consent forms to access his credit report in regard to financing the purchase of any vehicle and that, in any event, there is no evidence that a report was obtained in regard to the potential purchase of the Malibu. (Def.'s Reb'l Mem. Supp. Mot. Summ. J. at 6) (Def.'s Reb'l Mem.) (docket entry no. 71). While one of the "broad" agreements referenced by the Defendant appears to concern financing for what is identified as the Corolla which the Plaintiff contends—without apparent evidentiary support—was inserted after-the-fact, and the second agreement cited appears to relate to the trade-in of the Plaintiff's used car so as to present an issue or issues of disputed fact as to the scope of any express authorization, the issue is not a genuine one in the parlance of summary judgment because the Defendant had, in any event, the implicit authority by statute to access the Plaintiff's credit report for legitimate purposes. *Id.* (citing exs. 2–3 to the pleading).

strictures of ECOA simply because it designated itself as such in the unambiguous RISC. (Pl.'s Opp'n at 15). The court's difficulty is based on the reality of the market place in which a car dealership seldom, if ever, funds the transaction and the Plaintiff's clear understanding that a third party lender would be providing the financing. (Findings ¶¶ 3, 5). However, it is not necessary to resolve the issue here, at least for now.

13. The court held in an earlier decision that the FCRA applied only to credit reporting agencies as opposed to both credit reporting agencies and other "users." *Davis v. Reg'l Acceptance Corp.*, 300 F.Supp.2d 377 (E.D.Va. 2002). The court regrets the oversight where additional provisions of the statutory scheme do apply to various users in addition to just credit reporting agencies. 15 U.S.C. § 1681b(f).

14. Such expanded notice does not have to be provided if the information emanates from a credit reporting agency. *Id.*

Specifically, 15 U.S.C. § 1681b(a) permits such access "in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to ... the consumer" or for "a legitimate business need for the information in connection with a business transaction that is initiated by the consumer." 15 U.S.C. § 1681(a)(3)(A); § 1681(a)(3)(F)(I). Accordingly, and aside from the Plaintiff's own deposition testimony in which he reportedly confirmed that he clearly understood the Defendant was "going to go and check my credit," the Defendant had a permissible purpose to do so. (Def.'s Mem. at 13–14, citing Padin dep.). At the same time, however, it is undisputed that the Defendant did not provide any written notice to the Plaintiff regarding the reason(s) for the action taken by the various creditors or how the Plaintiff could ascertain such information and, therefore, even though the Defendant did not forward the Plaintiff's credit report onto the various lenders, the Defendant was a participating creditor in the transaction for the reasons previously discussed in conjunction with ECOA and had the obligation to provide notice under FCRA of the adverse action taken by CPS. Therefore, the Defendant violated the FCRA as asserted in Count Two of the Complaint as concerns the CPS activity and partial summary judgment in regard to that claim of liability is therefore appropriate.[15] However, as to any claim regarding adverse action taken by additional lenders, although there is the sug-

gestion that finance companies other than CPS responded to the "dealer track" application initiated by the Defendant, it is not clear what the responses were, if any, so as to constitute adverse action for which the Defendant, as a participating creditor, had an obligation to notify to the Plaintiff. (Pl.'s Opp'n, ex. 7 at 18–20). Accordingly, a genuine issue of disputed fact exists as to any additional liability on the part of the Defendant pursuant to a possible FCRA violation and summary relief cannot therefore be granted at this juncture.[16]

### Count Three (TILA)

TILA requires that the essential aspects of proposed financing be put in writing in a clear and conspicuous manner and disclosed to the consumer before consummation of the subject transaction. 12 C.F.R. § 226.17 (Regulation Z). The Plaintiff asserts that the Defendant violated TILA by obtaining his signature on the RISC before providing him with a copy that he only received after the transaction was consummated. (Pl.'s Mem. at 10–12). He also asserts a TILA claim on the basis that the various financing terms in the RISC should have been calculated from the date the transaction was to be funded instead of the date the RISC was signed, or they should have been marked as estimates where the date of prospective funding could not be immediately ascertained. (Compl., Count 3).

As to the latter issue, the greater weight of authority, both in this court and

---

15. As a practical matter, the Defendant was in the best position to verify the reason for the action because it had instructed the Plaintiff to obtain the employment verification that was lacking and which was the basis for the ultimate denial of financing. (Findings ¶¶ 16–17).

16. Of course, any lender that is "pulling" the consumer's credit report in order to decide

whether to accept a credit application is under separate statutory requirements regarding access and notice, but that does not mean the originating source (the automobile dealer) has an obligation to notify the consumer if the lender did not put the dealer on notice of the non-acceptance or denial, let alone the reason(s) for such action.

circuit as well as elsewhere, is that the practice followed by the Defendant here in calculating the financial terms of the transaction as of the date the contract is signed, without labeling them as estimates, does not constitute a violation of TILA. The reasoning of such authority is that the transaction is consummated as of the date the RISC is executed, subject only to a funding condition that may void the transaction, but which does not affect the accuracy of the calculation unless the dealer has the consumer execute a new RISC or backdates the effective date of the agreement so as to cause the consumer to pay interest before he was legally obligated to do so. (Def.'s Mem. at 16–20) (citing cases).[17]

█ Furthermore, as to the remaining TILA claim, this court (J. Spencer) has held that the required disclosures need not be provided to the consumer before consummation in a form separate from a RISC and that the required timing for such disclosure is satisfied by allowing, as here, the opportunity for the consumer to read the RISC before signing it. *Nigh v. Koons Buick Pontiac GMC*, 143 F.Supp.2d 535, 548 (E.D.Va.2001) *aff'd*, 319 F.3d 119 (4th Cir.2003), *rev'd on other grounds*, 543

U.S. 50, 125 S.Ct. 460, 160 L.Ed.2d 389 (2004).[18] Summary judgment is therefore required in favor of the Defendant as to Count Three of the Complaint, there being no remaining *genuine* issues of disputed material fact.[19]

*Count Four (VCPA)*

█ In order to sustain a claim under the VCPA, a plaintiff must prove that the defendant acted with an intent to deceive or otherwise mislead, *i.e.*, with fraudulent intent, as to a material fact on which the plaintiff relied to his detriment *and* which resulted in measurable damages. *See, e.g., ITT Hartford Group, Inc., v. Financial Assocs.*, 258 Va. 193, 520 S.E.2d 355, 361 (1999); *Colonial Ford Truck Sales, Inc. v. Schneider*, 228 Va. 671, 325 S.E.2d 91, 94 (1985). The Plaintiff asserts that he was purposely misled by an agent of the Defendant who told him at the time of sale that financing had been approved. (Findings ¶ 18). The Plaintiff contends that he relied to his detriment on the false representation and suffered the loss "of his trade-in, lost his new car, lost time dealing with Defendant, was inconvenienced by being left without his new car, was humiliated

---

17. The court is persuaded that its prior reasoning in *Davis* on this additional issue has been rejected by more persuasive (if not controlling) authority since the opinion issued.

18. The Plaintiff cites *Polk v. Crown Auto, Inc.*, 221 F.3d 691 (4th Cir.2000), as controlling authority for the proposition that the written terms of the proposed financing must be provided to the consumer before consummation. (Pl.'s Opp'n at 24). Aside from the fact that the *Polk* decision precedes the Fourth Circuit's affirmance of the district court's holding in *Nigh*, the district court in *Nigh* distinguished *Polk* on the basis that it is not clear from the facts of that case that the terms were presented to the consumer in writing or just discussed orally and not provided until after consummation. The court held in any event that the practice of giving the consumer, as

here, the opportunity to review the terms set forth in the RISC—whether he takes advantage of the opportunity or, as here, not—is sufficient and the court of appeals affirmed without disagreement. *Nigh*, 143 F.Supp.2d at 548.

19. Although the Plaintiff asserts that the Defendant's agent, in effect, "hid" the RISC from him ("[he] would not permit him to pick them up off the desk ... [t]he finance manager held them down,") it is undisputed by the Plaintiff's own deposition testimony that he did not read any of the pertinent paperwork before signing when he obviously would have had the opportunity to do so and, therefore, any factual dispute about what led up to that moment is not material. (Pl.'s Mem. ¶ 10; Findings ¶ 13).

and embarrassed, and made very upset." (Pl.'s Opp'n at 25–27). The Plaintiff also asserts that he suffered "several turndowns on his credit report which negatively affect it." *Id.* at 27. The Defendant retorts that the Plaintiff cannot show any actual loss because he was paid for his trade-in as much as he thought it was worth, had the one check he issued for the first installment payment returned, and could not identify at deposition any loss that he suffered as a result of the alleged fraud. (Findings ¶¶ 30, 32; Def.'s Mem. at 24–25, citing Padin dep.).

■ Even though there is authority, as cited by the Plaintiff, for the proposition that "[u]nder Virginia law, damages that are recognized at law as pecuniary damages include the amount necessary to compensate plaintiffs for their lost time, inconvenience, and physical discomfort caused by wrongful actions in a consumer transaction," one does not—cannot—reach that point here because the undisputed evidence is that the Defendant, whether by mistake or otherwise, proceeded to transfer title to the Plaintiff upon execution of the RISC.[20] Such a circumstance is inconsistent with any possible intent to defraud. The typical scenario that the court encounters, and that would allow for at least a reasonable inference of fraudulent intent sufficient to defeat summary judgment, is where the consumer is typically told "the car is yours and we'll take care of the title work," but where the dealer holds on to "the paper" without sending it on to the licensing agency, until it sees that financing has been finalized and, if financing fails, the vehicle comes back to the dealer through repossession efforts just like the proverbial yo-yo (a "yo-yo" sale as it has been dubbed by the consumer protection bar).

### Count Five (fraud)

Presumably, the Plaintiff asserts the common law claim for fraud as an alternative to that set forth in Count Four. Summary relief must be granted to the Defendant for the same reasons that require dismissal of the alternate claim where both require proof of fraudulent intent which is lacking as a matter of law.

### Count Seven (unlawful conversion)

In his Complaint, the Plaintiff asserts that the Defendant had committed the tort of conversion by "taking" the vehicle after it was owned by the Plaintiff. (Compl., Count 7). The court (J. Hudson) previously dismissed the claim for two reasons: first, because "the terms of the purchase were conditioned upon approval of the Contract," *i.e.*, obtaining the financing; *and* second, "Padin may have had possession of the vehicle, but title did not pass during the sales transaction." (Mem. Op., Sept. 17, 2004, at 7). The court based the latter reasoning on the belief that title had not been transferred to the Plaintiff when, in fact, it had. (Findings ¶ 25).[21] The Plaintiff has now filed a motion pursuant to Rule 60 to set aside the district court's dismissal of the claim on the basis that any one or all of the grounds for relief as set forth in the Rule are present. (Pl.'s Mem. Supp. Pl.'s Mot. Relief J. Order at 2–3) (docket entry no. 73). In response, the Defendant argues that the Plaintiff cannot assert as the basis for his motion the fact

---

**20.** As suggested by the fact that it was not discovered that title had passed until full discovery was underway after the court (J. Hudson) had dismissed the conversion claim based, in part, on a mistaken understanding that it had *not*.

**21.** The court is satisfied that neither Plaintiff's nor Defendant's counsel became aware of the circumstance of title having passed until subsequent discovery such that no intentional misrepresentation was made to the court.

that title had passed without first amending his complaint to properly allege such an element of the cause of action for conversion, and that to allow restoration of the claim would be futile in any event because any damages the Plaintiff could claim would certainly be offset by the greater value of the vehicle for which payment was never made. (Def.'s Reply Mot. Relief J.) (citing cases) (docket entry no. 74).

■ Without addressing whether recoverable damages may encompass multiple aspects, including "inconvenience, aggravation, humiliation, and other emotional and mental anguish and distress" that may exceed any possible offset for the value of the vehicle (assuming that is a proper measure for offset); whether the Plaintiff failed to pay for the vehicle or was precluded from doing so by the Defendant's actions and was current "with the agreed-upon installment schedule"; or whether the Complaint adequately alleges a cause of action for conversion by simply asserting that the "taking by Oyster Point Dodge constituted the tort of conversion as the vehicle was then owned by the Plaintiff," the motion must be denied for a different reason. (Compl.¶¶ 81, 83). Simply stated, the court based its holding on *two alternative* grounds, namely, that the Plaintiff could not prove "rightful" ownership because the transaction was conditioned upon final financing, *and* the fact that title had not passed. (Mem. Op., Sept. 7, 2004, at 7). The "newly discovered" evidence which led to the "mistake" that could justify relief only relates to the additional element for establishing ownership as found by the court. While the court cited Virginia law that title to a

vehicle must pass to accomplish transfer of ownership, the court also found in regard to the subject transaction that there was the additional element of ownership in this transaction for the obtaining of necessary financing. Accordingly, to grant Plaintiff's motion would be futile, with or without amendment of the Complaint, and so the claim of unlawful conversion must remain dismissed.

*Count Eight (Unlawful Repossession)*

For his final claim, the Plaintiff asserts in a pendent state count that the Defendant violated Article 9 of the Uniform Commercial Code (UCC), as adopted into Virginia law, by repossessing the subject vehicle (the collateral) without just cause or authority and by failing to provide notice of its intent to either retain or dispose of it. (Pl.'s Mem. at 12–13). The Defendant responds that the Article 9 notice provisions do not apply to the situation here because it had not asserted a security interest in the vehicle which must be noted on the title in any event (and was not), and the vehicle has not been disposed of even as to the present time so as to require notice of proposed disposition. (Def.'s Mem. at 28–29) (citing authority).[22]

Without addressing the Defendant's "confession" that the relevant provisions of the UCC do not apply because the Defendant did not have a security interest in the vehicle which logically leads to the argument that, if not, how could the vehicle have been taken legally with all the consequences that any illegal action would generate, there are two basic issues involving the repossession that are either singly, or in combination, dispositive of the matter: (1) did the Defendant have the authority,

---

**22.** Apparently, the vehicle remains in Defendant's possession, but it cannot be sold without the consent of the Plaintiff (or as the result of judicial action) because title remains in Plaintiff's name. (Findings ¶¶ 25, 31). Perhaps the parties will now be motivated to resolve the dilemma by settlement given the resolution of various issue herein.

contractual or otherwise, to repossess the vehicle?; and (2) if so, did the Defendant nevertheless fail to provide any required notice to the Plaintiff?

A secured party may take possession of the collateral, but only *after* default. Va. Code Ann. § 8.9A–609(a)(1). A secured party includes "a person in whose favor a security interest is created or provided for under a security agreement" as well as "a *trustee,* indenture trustee, *agent,* collateral agent, *or other representative in whose favor a security interest . . . is created or provided for."* Va.Code Ann. § 8.9A–102(72)(A), (E) (emphasis added). Additionally, "[e]very aspect of a disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable." Va.Code Ann. § 8.9A–610. Furthermore, although no period is specified in which a secured party must dispose of the collateral, if a secured party "holds collateral for a long period of time without disposing of it, and if there is no good reason for not making a prompt disposition, the secured party may be determined not to have acted in a 'commercially reasonable' manner." *Id.,* (UCC cmt. n.3). Also, a secured party must send notice to the debtor if it seeks to accept the collateral in partial or full satisfaction of the secured obligation, or if it intends to dispose of the collateral that must still be accomplished in a commercially-reasonable manner. Va.Code Ann. §§ 8.9A–611, 613, 621, 627.

■ Here, the Defendant did, in fact, acquire a secured interest in the subject collateral by virtue of the terms of the RISC, and, regardless, it is properly viewed as an agent of the lender, CPS, or as any "other representative in whose favor a security interest . . . is created or provided for . . . ," such that repossession could be effected, but *only* after default. (Def.'s Mem., ex. 12 ¶ 2(c) (the RISC)).

However, the Plaintiff was not in default of the conditional contract as of the date of repossession (March 19) where he had already tendered the first installment payment several days before (March 15) and was not otherwise in default. (Findings ¶¶ 26–30). Moreover, even if the Defendant had the authority to repossess the collateral, there is at least a genuine issue of disputed material fact as to whether "commercially reasonable" methods were utilized in retaining the collateral for such an inordinate period of time (March 19, 2004, to present), and whether the Defendant intended to accept the collateral in at least partial satisfaction of the obligation by attempting to sell it as a used vehicle so as to trigger the requirement to provide notice to the Plaintiff of its intent to effect disposal. (Findings ¶ 31). Regardless of the resolution of the latter issues, there is no remaining genuine issue involving disputed material fact as to the Defendant's lack of authority to repossess the collateral *in the absence* of default by the Plaintiff. Therefore, the Plaintiff's motion for partial summary judgment as to Count Eight must be granted, with a damage award of the statutorily-mandated amount of "the credit service charge plus ten percent of the principal amount of the obligation or the time-price differential plus ten percent of the cash price," the Plaintiff having waived his right to seek any additional or alternate relief. Va.Code Ann. § 8.9A–625; Pl.'s Mem. at 13.

**CONCLUSION**

This is yet another in a continuing series of consumer-related cases in which several federal and state statutory schemes involving complicated consumer sales relationships interface. The controlling case law as to the interpretation and application of the various legislative mandates continues to evolve depending on fact-specific sce-

narios such as exists in this case. Although many of the issues here have been resolved on summary judgment—at least for the time being—others remain for resolution by the factfinder unless the parties resolve the continuing dilemma by mutual agreement to avoid further effort and expense. In the meantime, an appropriate Order shall issue that will reinstate the matter on the court's active trial docket.

### ORDER

This matter is pending before the court on several motions submitted by the Plaintiff and the Defendant, Oyster Point Dodge, Inc., including cross motions for summary judgment on some or all of the remaining claims. For the reasons set forth in the accompanying Memorandum Opinion, it is hereby ORDERED that the motions are GRANTED in part and DENIED in part or DENIED in their entirety as follows:

1. The Plaintiff's Motion for Partial Summary Judgment (docket entry no. 55) is GRANTED as to Count One (ECOA) on liability only, Count Two (FCRA) as to liability involving the CPS credit denial only, and Count Eight (Unlawful Repossession) as to both liability and damages, and DENIED in all other respects;

2. The Defendant's Motion for Summary Judgment (docket entry no. 53) is GRANTED as to Count Three (TILA), Count Four (UCPA), Count Five (fraud), and DENIED in all other respects;

3. The Plaintiff's Motion for Relief from Judgment or Order (docket entry no. 72) is DENIED;

4. The Plaintiff's motion to strike Oyster Point Dodge's Motion for Summary Judgment is DENIED; and

5. Counsel are directed to contact chambers within ten (10) days of this date to schedule a status conference regarding the remaining issues.

It is so Ordered.