Bacharach, J.,
concurring in part and dissenting in part.
■ I respectfully concur in part and dissent in part. I join the majority in affirming the district court’s denial of the Woodses’ motion to alter or amend the judgment and First National Bank of -Durango’s motion for attorney fees. See Maj. Op. Parts 11(A), (C). But I respectfully dissent regarding affirmance of the denial of the Woodses’ motion for a new trial. See Maj, Op. Part 11(A), On that ruling, I would reverse. As a result, I would decline to reach the Woods-es’ challenges on the evidentiary rulings. See Maj. Op. Part 11(B).
* * *
In Part 11(A), the majority addresses a claim under the Equal Credit Opportunity Act. For this claim, the historical facts are largely undisputed. Mr. and Mrs. Woods applied in March 2008 for both a construction loan and a take-out loan. The construction loan would require repayment within eighteen months.
The Woodses knew that they could not repay the loan within eighteen months. But they could repay the loan if the bank approved the second of the requested loans. That loan was called a take-out loan and would permit repayment within 30 years. Approving the construction loan without approving the take-out loan would do the Woodses little except to require the impossible: repayment of a loan in eighteen months without any possibility of avoiding a delinquency.
But that was precisely the dilemma thrust upon the Woodses. The bank quickly approved the construction loan and tentatively approved the take-out loan. Then, in August 2008, the bank internally decided to deny the take-out loan. But the bank declined to tell the Woodses that they would not get the take-out loan. The Woodses knew that they would need to repay the construction loan within eighteen months, but they did not know that the bank had denied the application for a take-out loan.
*693 The bank waited until January 2009 to suggest to the Woodses that they might consider alternative financing. In April 2009, the bank decided that it might reconsider if the Woodses were to file a “new application.” Appellants’ App’x at 695. The Woodses filed a new application in September 2009, which became complete on October 10, 2009. The bank then rejected this new application.
The delay in denying the March 2008 application for a take-out loan created liability under the Equal Credit Opportunity Act. The jury’s contrary decision is impossible to reconcile with existing law and the facts elicited at trial. Thus, in my view, the district court erred in denying the Woods-es’ motion for a new trial. Because the majority disagrees in Part 11(A), I respectfully dissent on this part of the order and judgment.
I. Standard of Review
In considering this ruling, we apply the abuse-of-discretion standard. See Elm Ridge Exploration Co., 721 F.3d at 1216; Loughridge v. Chiles Power Supply Co., 431 F.3d 1268, 1275 (10th Cir. 2005).
II. The Undisputed Evidence of an Adverse Action Without the Required Notice
The Equal Credit Opportunity Act generally sets a 30-day time limit for a bank to notify a borrower of any adverse action taken on a completed loan application. 15 U.S.C. § 1691(d)(l)-(2); 12 C.F.R. § 202.9(a)(1). An application is “complete” if the bank “has received all the information that the [bank] regularly obtains and considers in evaluating applications for the amount and type of credit requested ....” 12 C.F.R. § 202.2(f). And the term “adverse action” refers to
a denial or revocation of credit, a change in the terms of an existing credit arrangement, or a refusal to grant credit in substantially the amount or on substantially the terms requested. Such term does not include a refusal to extend additional credit under an existing credit arrangement where the applicant is delinquent or otherwise in default, or where such additional credit would exceed a previously established credit limit.
15 U.S.C. § 1691(d)(6).
Under these definitions, the bank would have been in violation of the Equal Credit Opportunity Act upon proof of four historical facts:
1. The Woodses applied for a take-out loan in March 2008.
2. The bank took adverse action on the March 2008 application in August 2008.
3. The application was complete at the time of the adverse action.[1]
4. The bank did not notify the Woodses of the adverse action within 30 days of August 2008.
The bank denies violating the Act, arguing that the Woodses did not complete an application for a take-out loan in March 2008 and that there was no adverse action taken in August 2008. In addition, the bank argues that the verdict form was ambiguous and could have been referring to the second application (made in September 2009), which would not have resulted in a statutory violation.
*694 In my view, however, the undisputed evidence showed the presence of each of the four historical facts. And even if the verdict form had been ambiguous, the district court should have granted the motion for a new trial because of the overwhelming evidence of a statutory violation.
A. The Woodses applied for a permanent take-out loan in March 2008.
The bank argues that a jury could reasonably have found that the Woodses did not apply for a take-out loan in March 2008. Appellee’s Resp. Br. at 25-28. I disagree.
The bank points out that the Woodses’ loan application in March 2008 contained multiple boxes. Two of these boxes referred to “Construction” and “Refinance” and were checked. Three other boxes said “Purchase,” “Construction-Permanent” and “Other (explain)” and were not checked. Appellant’s App’x at 676. Because the “Construction-Permanent” box was unchecked, the bank argues that a jury could reasonably find that the Woodses had not applied for a take-out loan in March 2008.
For two reasons, this argument cannot be reconciled with the evidence as a whole. First, shortly after the Woodses completed the application in March 2008, the bank generated internal documents unambiguously discussing the application as one for both a construction loan and a take-out loan. Id. at 132 (“Purpose: Construction loan”); id. at 138 (“Purpose: Permanent take-out for [First National 'Bank of Du-rango] construction loan”). Second, as discussed below, bank officials indisputably decided by August 2008 to deny the application for a take-out loan. How could bank officials have denied an application that didn’t exist?
B. The bank took adverse action in August 2008 by denying the March 2008 application for a take-out loan.
The bank denies that it took adverse action in August 2008 on the application for a take-out loan. This denial is based on two arguments. First, the bank argues that a jury could reasonably find that the bank had not decided to deny the application for a take-out loan as early as August 2008. Second, the bank argues that any such denial would not constitute an adverse action because the Woodses were already delinquent on their construction loan.
In my view, both arguments fail as a matter of law. The undisputed evidence shows that the bank decided to deny the take-out loan in August 2008. And even if the Woodses were delinquent on the construction loan, the bank’s denial of the application for a take-out loan would still constitute adverse action.
1. The bank denied the application for a take-out loan in August 2008.
The evidence overwhelmingly shows that the bank denied the application for a takeout loan in August 2008. In my view, a jury could not reasonably have found otherwise.
The decision-makers for the bank were Mr. Ronald Dunavant and Mr. Kent Curtis. Mr. Dunavant testified about the bank’s August 2008 decision in the following exchanges:
Q: After you became aware of these various problems, what did you do?
A. The discussions with [Mr. Curtis], with discussions with the Woods[es] as we went along. Progress was made on the construction that w[as] going on, but we were aware that we would not be able to make a long-term permanent takeout so I *695 encouraged them to find other financing to take that loan out when it was done.
Q. About when did you make that decision?
A. I believe that was in the August 2008 area.
Q. And who made that decision?
A. Kent Curtis,
Appellants’ App’x at 554.
Q. And [] you and Mr. Curtis, sometime in August 2008, determined that the First National Bank of Du-rango was not going to make the permanent loan, correct?
A. I don’t remember the timeline exactly, but that decision was made.
Q. Well, at your deposition, did you say about four months in?
A. Approximately, yes.
Q. So am I in the right time frame?
A. Fairly close, I think.
Q. You can accept it as the time frame, then?
A. I’ll do my best.
Q. No, I’m asking, can you accept it as the time frame four months in?
A. I believe the record shows that, yes, sir.
Q. So you are aware of what the time frame was, then?
A. Close. Yes.
Id. at 591-92.
Mr. Dunavant undoubtedly had the power to make this decision. He was a loan officer in charge of managing the Woodses’ construction loan in 2008 and 2009. His direct supervisor was Mr. Curtis. As a practical matter, Mr. Dunavant and Mr. Curtis were in charge of making decisions about all of the Woodses’ applications, including the first one for a take-out loan.
Ms. Melissa Zureich, the chief credit officer and executive vice president of the bank, acknowledged that the decision made by Mr. Dunavant and Mr. Curtis would constitute a decision by .the bank itself:
Q. Did you review Mr. Dunavant’s testimony [in regard to his decision to deny the take-out loan]?
A. I have.
Q. And did you see that he stated: Mr. Curtis and I, in August of 2008, decided not to make this loan?
A. I have read that. •
Q. And do you believe that to be true or untrue?
A. I believe it to be true.
Q. So as of August 2008, the bank had determined it was not going to be making'the permanent loan; is that correct?
A. According to that testimony, yes.
Q. And you believe it to be true, right?
A. Yes.
Id. at 329-30.
The bank does not question the fact that bank officials decided to deny the application for a take-out loan in August 2008. Instead, the bank points to its conditional approval of the take-out loan in April 2008, which stated that approval was conditional on “re-verification” of the information in the Woodses’ loan application. It’s true that the bank’s documents referred to re-verification. But there’s also no question that bank officials had already decided in August 2008 to deny the application for a take-out loan.
As the bank points out, the Woodses submitted a new application for a take-out loan in September 2009. If that were the first application, the bank’s notice of an adverse action would be considered timely. But no reasonable fact-finder could possibly regard the application for a take-out *696 loan in September 2009 as the first application. More than a year earlier, bank officials had already decided to deny the Woodses’ application for a take-out loan. The Woodses submitted the second application in September 2009 because that’s what they were instructed to do. See Appellants’ App’x at 695 (noting that the bank informed that Woodses that it had rejected the first take-out loan and that the bank would allow the Woodses to file a “new application”).
The bank’s references to “re-verification” or disposition on the second loan application in September 2009 do not wipe away what had taken, place earlier. Thirteen months earlier, bank officials had already decided to deny the Woodses’ application for a take-oút loan. Subsequent reverification, and a new application could not undo that fact.
2. Any delinquency on the construction loan is irrelevant.
The bank also argues that any denial of the take-out loan would not constitute an adverse action because the Woodses were then delinquent on the construction loan. For this argument, the bank points out that “adverse action” “does not include a refusal to extend additional credit under an existing credit arrangement where the applicant is delinquent or otherwise in default.” 15 U.S.C. § 1691(d)(6).
This argument is invalid as a matter of law. Like the statute, the regulations state that this affirmative defense applies when the action relates “to an account taken in connection with inactivity, default, or delinquency as to that account.” 12 C.F.R. § 202.2(c)(2)(ii) (emphasis added).[2] Under the statute and regulations, the bank could avoid liability only if the Woodses had been delinquent on the take-out loan. But, the Woodses couldn’t have been delinquent on that loan because it had never been issued. The only loan issued was the construction loan, not the takeout loan.
The bank does not argue to the contrary. Instead, the bank contends only that the Woodses were delinquent on the construction loan. The problem is that the Woodses are not claiming that the bank took adverse action on the construction loan; their claim involves adverse action on the application for a take-out loan. Thus, the bank cannot avoid liability based on the Woodses’ delinquency on the construction loan.
C. The Woodses’ March 2008 application for a take-out loan was complete when the application was denied.
The bank argues that its action in August 2008 could be considered “adverse” only if the application for a take-out loan had been complete by that time. The bank points out that in April 2008, the bank provisionally approved the take-out loan subject to reverification. According to the bank, it asked the Woodses to submit the second application to allow this reverification. For the sake of argument, we may assume that the bank could not have taken an adverse action on the take-out loan unless that application had been complete by August 2008. Even with this assumption, there is no question that the applica *697 tion for a take-out loan was complete by August 2008.
The Equal Credit Opportunity Act’s regulations state that a loan application is considered complete when the “creditor has received all the information that the creditor regularly obtains and considers in evaluating applications for the amount and type of credit requested” from the applicant. 12 C.F.R. § 202.2(f).
Any reasonable jury would have to find that by August 2008, the bank had received all of the information that is regularly considered when evaluating loan applications. The bank does not deny that it had all the required materials in April 2008, when the bank provisionally approved the Woodses’ application for a take-out loan; the bank said only that it would be reverifying the correctness of the information. And even without reverification, bank officials testified that they had decided by August 2008 to deny the application, establishing that the bank had everything needed for a decision.
Though the bank contends that it needed reverification, its internal documents characterized the submission in September 2009 as a “new application” because the bank had already denied the first application. Appellants’ App’x at 695.
In sum, the bank had everything it needed by August 2008, so the Woodses’ application for a take-out loan was complete by that time.
III. The Bank’s Other Arguments
Finally, the bank argues that regardless of whether it violated the Act with respect to the March 2008 application, the verdict form was ambiguous about which loan application was being addressed. According to the bank, the jury could have read the verdict form as referring to the Woodses’ September 2009 application. And, as discussed above, the bank timely responded to the application submitted in September 2009. The bank contends that the Woodses bypassed any opportunity to object to the verdict form, precluding reversal.
I would reject this contention, for the problem with the verdict is unrelated to an ambiguity in the jury’s findings; the problem is that the evidence overwhelmingly showed that the bank had failed to provide timely notice after deciding to deny the application for a take-out loan. The potential ambiguity of the questions posed to the jury would not have affected the predominance of evidence creating liability. Thus, the Woodses are entitled to a hew trial regardless of whether they had objected to the verdict form.
* * *
In my view, the verdict conflicted with the great weight of the evidence. The undisputed evidence showed that
• the Woodses had applied for a takeout loan in March 2008,
• bank officials had decided in August 2008 to take adverse action on that application,
• the application had been complete at the time of the adverse action, and
• the bank had not notified the Woods-es of the adverse action within the statutory time-period.
Therefore, the bank’s actions created liability under the Equal Credit Opportunity Act. And as noted above, the ambiguity in the verdict form does not change this fact. As a result, I believe that the district court erred in denying the Woodses’ motion for a new trial. In these circumstances, I respectfully dissent from the majority’s conclusion in Part 11(A).

. The Act’s implementing regulations provide that even if a bank takes adverse action "on an incomplete application,” the bank must provide notice of that action (subject to certain exceptions). 12 C.F.R. § 202.9(a)(1)(h). The Woodses do not rely on this provision. Nor do I.

. The regulation was adopted under a statutory delegation of authority to the Consumer Financial Protection Bureau. 15 U.S.C. § 1691b(a), This regulation would trigger substantial deference if the statute were ambiguous. See Treadway v. Gateway Chevrolet Oldsmobile Inc., 362 F.3d 971, 975 n.3 (7th Cir. 2004) (according substantial deference to 12 C.F.R. § 202.2(c)(l)(i)). We need not decide whether § 1691(d)(6) is ambiguous, for that section itself exempts bank action relating to "an existing credit arrangement,” not a new loan application. 15 U.S.’C. § 1691(d)(6).